UNITED STATES DISTRICT COURT **RECEIVED**
DISTRICT OF MINNESOTA

AUG 28 2023

CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

**Claire J. Lee**,

**Plaintiff,**

**COMPLAINT**

V.

**The City of Bloomington**,
**Bloomington HRA, Premier Properties**,
and **Andrew Akins.**

**JURY TRIAL DEMANDED**

**Defendants.**

SCANNED

AUG 28 2023

U.S. DISTRICT COURT MPLS

## I.   <u>INTRODUCTION</u>

## II.   <u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343. This

action is authorized by 42 U.S.C. § 3613. The Court also has jurisdiction pursuant to 42

U.S.C. § 3601 and § 3604, *et seq*. The Court has supplemental jurisdiction to consider

state law claims pursuant to 28 U.S.C. § 1367.   Venue is proper as Plaintiff resides in

Minnesota and all of the Defendants do business in, have offices in, and are located in

Minnesota. Most, if not all, of the actions described herein took place in Minnesota.

## III.   <u>PARTIES</u>

2.      Plaintiff Claire Lee has resided at Lynvilla Apartments at 10101 Lyndale

Ave S, Apt 219, Bloomington, MN  55420 since June 2016. Plaintiff is 66 years old, she

has mental and physical disabilities and is reliant on Social Security and her Section 8

Housing Choice Voucher through Bloomington HRA. Plaintiff has severe physical and mental health disabilities and they substantially limit one or more major life activities in the areas of interacting with others, thinking, working, personal care and housekeeping, concentrating, mobility and other major life activities. She is, therefore, a qualified person with disabilities under the Fair Housing Act (FHA) and the Minnesota Human Rights Act (MHRA).

3.     The stress of being harassed, discriminated against and retaliated against has significantly exacerbated Plaintiff's mental and physical symptoms. Plaintiff has had to double her normal medication dosage and has had to increase her regular doctor visits from every 3 months to approximately every month. In addition, Plaintiff is on a new medication for severe depression caused by Defendants' actions.

4.     Defendant City of Bloomington (Bloomington) has their main offices in the City Hall complex at 1800 W Old Shakopee Rd, Bloomington, MN 55431.

5.     Defendant Bloomington HRA (HRA) is located at 1800 W Old Shakopee Rd, Bloomington, MN 55431. Bloomington HRA is a division of the Community Development Department of the City of Bloomington. Although the HRA receives federal funds for its Housing Choice Voucher (HCV) program and operates using those funds, the employees of HRA are City of Bloomington employees and were hired by the City of Bloomington. The HRA further uses City of Bloomington services, such as Bloomington's accounting department for the handling of its disbursements, etc. Bloomington also advertises the HRA as one of its departments through its website and newsletters.

6.      Defendant Premier Properties (PP), a Minnesota corporation, is located at 5416 W 70th St, Edina, MN  55439 and is the current management company/owner of the Lynvilla apartment complex. On information and belief, Andrew Akins is an owner and operator of this complex and he is responsible for making decisions and rules concerning this property.

7.      Defendant Housing & Urban Development (HUD) is a housing and urban development department within the federal government and has their local field office at 212 3rd Ave S, Suite 150, Minneapolis, MN  55401.  HUD implements, provides funding and makes rules for the Housing Choice Voucher (HCV) program, formerly known as Section 8, that plaintiff utilizes and needs to pay her rent.  Michele K. Smith is the Field Office Director for this area.

### III.   FACTS

8.      Plaintiff moved into the Lynvilla apartment complex in June of 2016. Plaintiff was a victim of the Crossroad's gentrification sale after having lived at that complex for 20 years.  Plaintiff was forced to move because Crossroads' new owners upgraded the property, substantially increased rents and no longer accepted Section 8 vouchers in order to attract a more upscale renter.  More than 2000 people were forced to move and find new housing in an already overstressed and inadequate affordable housing crisis.  Plaintiff had great difficulty in finding new housing and was forced to move to a new city.  Plaintiff had numerous problems porting her voucher from Richfield to Bloomington, including but not limited to, Bloomington HRA denying her the voucher that Richfield HRA had approved and Bloomington HRA then subsequently denied

3

Plaintiff the apartment that Plaintiff worked so hard to find.  Plaintiff was so despondent, devastated, scared, traumatized, depressed and anxious about going homeless and having the apartment taken from her that this resulted in Plaintiff attempting suicide in May of 2016, caused by Bloomington HRA and Premier Properties.  HUD intervened and Plaintiff ultimately got the apartment that Premier Properties attempted to re-rent to someone else, even though Plaintiff had a signed lease on it.  However, not until Plaintiff was severely damaged by their actions and as a result had little time or energy to pack and move.  Because of this, Plaintiff's belongings got packed and moved hurriedly and in an unorganized mess and things got moved into her apartment that should have been moved to storage and vice versa.

9.      After Plaintiff moved to her apartment, Plaintiff's apartment was too full of boxes and unorganized mess for Plaintiff to handle it on her own and Plaintiff was depressed, scared, and left with deteriorating mental and physical health as a result of Bloomington HRA and Premier Properties.  Plaintiff was and has been unable to unpack and organize much of anything in her apartment on her own and has also been scared to unpack for fear that she would be forced to move again.  The trauma of having two apartments taken from her and almost going homeless exacerbated a small manageable hoarding problem into a major hoarding disability/illness.  Plaintiff has diagnosed PTSD resulting from this and trauma is a major factor in exacerbating hoarding tendencies.

## PREMIER PROPERTIES

10.     In April 2020, the federal government issued a lockdown due to a new pandemic of a deadly virus that was highly contagious and spreading very fast and killing

thousands of people worldwide.  The State of Minnesota issued similar lockdowns and had strict rules and executive orders severely limiting our activities over the course of many months and this lessened over time as more became known about the covid virus and after vaccination and treatment options had been developed.  In the beginning, all efforts were being made to "slow the spread" and to just engage in necessary and essential activities, like grocery shopping and to just stay home as much as possible. Most retail stores, restaurants, gyms, schools, places of worship, government services, and others were closed for many months.  Over a million people in the United States died from covid.  The covid virus was particularly dangerous and deadly for those people with high risk conditions, such as obesity and those over 65, which made Plaintiff a high risk person to be especially careful to stay away from possible risk of exposure to covid.

11.    In or about May, 2020 Plaintiff received notice from her landlord Premier Properties that they would be entering every tenant's apartment to do a fuse box changeover (from fuses to breaker box), which would entail roughly 5-6 hours of essentially construction/demolition and electrical work and then cosmetic work to repair the damage over a period of 2 days.  We were still under lockdown or under the Governor's Executive Orders to refrain from doing unnecessary work in your home and to limit contact to slow the spread.  This was not essential work, nor did any fuse box need any repairs, it was work so that the landlord could get a cheaper rate on his insurance.  This did not comport with the Governor's Executive Orders. Plaintiff immediately notified her landlord that she was requesting reasonable accommodation due to her disabilities and because she was a high risk person who should not be exposed to

covid. She requested reasonable accommodation to not have the work done until fall and later, after the vaccine came out. Even though Plaintiff asked not to be bothered anymore about this and stated that it was exacerbating her disabilities, the landlord repeatedly pressured and threatened Plaintiff. Andrew Akins pounded on Plaintiff's door and left a note in the spring of 2021, he emailed and threatened to enter Plaintiff's apartment when Plaintiff was in the hospital in October of 2020 on IV antibiotics for a pacemaker infection and related surgery, Plaintiff received a phone call from him when she was shopping for a thermometer at Walgreens and he threatened that she had better comply, and his managers at the complex Petra and Bob Larson pressured Plaintiff over the fuse box change out. Petra told Plaintiff that since Petra and others had it done, then Plaintiff should be able to have it done, thereby minimizing her disabilities and shaming Plaintiff.

12.     In April, 2021 Plaintiff had the fuse box work done as the landlord would not wait any longer and he was finishing the fuse box work at his other properties. At this time, Plaintiff was still extremely scared of covid. Plaintiff was extremely scared and panicked about covid, particularly so until the vaccine came out and this eventually got better but lasted until about December 2022.

13.     Andrew Akins and the onsite property managers, Bob and Petra Larson, were very unhappy that Plaintiff asked for and needed reasonable accommodation and Plaintiff received numerous emails and negative actions regarding this. Plaintiff was even bothered and scolded in a hospital bed when she was on IV antibiotics for a severe infection and on the eve of heart surgery and he knew Plaintiff was in the hospital and very ill.

14.    Plaintiff has asked for reasonable accommodation prior to this.  Plaintiff asked for reasonable accommodation to have appointments and adequate notice for all repairs and the landlord has said no.  Plaintiff asked for reasonable accommodation for a garage when she signed her lease with Petra in about May 2016 and plaintiff asked yearly thereafter.  Petra told her she would put her on a waiting list for a garage but that there were 3 people ahead of her and that it would take a long while as the people with garages tended to live at the complex a long time and retain their garages.    Plaintiff is aware that people that moved in long after Plaintiff have been given garages at this complex while Plaintiff was repeatedly passed over for one.

15.    On or about August 11, 2021 Plaintiff received a phone call from Petra Larson, onsite property manager, and she alleged that the apartment below Plaintiff's apartment reported they had flies.   Petra said that they wanted an inspector to go into Plaintiff's apartment the next day and inspect.  Plaintiff told Petra that she didn't have flies and that due to her disabilities she would need more notice for (non-emergency) inspections and repairs and Plaintiff did not refuse inspection.  Plaintiff also commented that under MN law she was allowed at least 24 hours notice.   Petra was not happy, but ended the call.  Plaintiff did not hear any more from the landlord until Plaintiff had a surprise visit from the City of Bloomington Environmental Health Department on August 26, 2021.  There were three people standing and/or pounding on Plaintiff's door (see narrative below in Bloomington section) and they scared, surprised, shocked and terrified Plaintiff as Plaintiff was laying down due to illness.

16.     Unknown to Plaintiff, either Andrew Akins or Bob Larson called in a complaint to Bloomington Environmental Health about Plaintiff on August 19, 2021. The complaint states that Plaintiff is a hoarder and that her apartment is so bad that she has flies and smells so bad that the neighbors can smell it down the hall.  While it true that Plaintiff has developed the disability of hoarding, along with her other disabilities, Plaintiff hoarding consists of having too many possessions in her apartment causing an inability to use the rooms in a normal manner.  This has been very distressing to Plaintiff, but Plaintiff has never had any infestation of flies and does not ever have smells or accumulation of any garbage that would have smells.  The landlord filed a substantially false report about Plaintiff.  The landlord did not give Plaintiff any notice of any reporting to the City and did not accommodate Plaintiff's disabilities.  The landlord harassed Plaintiff for her disabilities and retaliated by filing a false report.  The landlord also did not tell Plaintiff of the City Inspection, so that it would be a surprise to Plaintiff. The Environmental Health Department told the landlord to tell Plaintiff about the inspection.

17.     Plaintiff has always been a good, quiet tenant who paid her rent on time. Plaintiff's drawbacks to this landlord is that she has disabilities that they do not want to provide reasonable accommodations for and for which Plaintiff has been harassed for.

18.     In July, 2022 Plaintiff notified Premier Properties by email that her electronic payment had bounced because Plaintiff had it set to pay the balance after the HRA paid their portion of her rent, ensuring that only her portion would be paid from her bank account.  The HRA did not pay their portion (described more fully below in the

HRA section of this complaint), so the full rent amount was automatically taken from Plaintiff's account. Plaintiff apologized and said that the HRA was refusing to pay their housing assistance payment (HAP), so Plaintiff was exploring other ways in which that part of the rent could be paid. Plaintiff's share of the rent was paid promptly after the bank unfroze the money in her account due to the overdraft. After much research into the HUD Housing Choice Voucher program, Plaintiff determined that the rules provided that housing authorities must pay the housing assistance payment as long as the tenant is residing on the property.

19. Bloomington HRA kept refusing to pay the HAP on behalf of Plaintiff, so this landlord sent Plaintiff eviction notices in July, August, September and October 2022, even though Plaintiff did not owe them any money, as Plaintiff had paid her portion of the rent. In July 2022, Plaintiff contacted Hennepin County to see if they could help Plaintiff pay the rent that Bloomington HRA owed to the landlord, so that Plaintiff would not get evicted as Plaintiff was very scared she might get evicted. In September, 2022 Andrew Akins sent an email to Plaintiff stating that he was starting eviction proceedings for nonpayment of rent the next day and this caused severe emotional distress and panic to Plaintiff who has PTSD, stemming from the loss of her housing twice, a suicide attempt and recurring fears and nightmares of going homeless. Mr. Akins did this, knowing that he would be evicting Plaintiff for the housing assistance payment, that he knew that Plaintiff was not responsible for. Mr. Akins also knew that under the HUD Housing Choice Voucher rules, he was not allowed to threaten or coerce Plaintiff to pay any rent more than was calculated by the HRA as the tenant's portion of the rent. He also

knew that the tenant was not responsible and could not be evicted for any rent that the Housing Authority owed which was Bloomington HRA.  Knowing all of this, Mr. Akins still chose to harass, threaten, coerce and shake down Plaintiff for rent she did not owe. He had a contract with the HRA and was bound by HUD rules, but consciously chose to terrorize Plaintiff to pay him money that he knew she didn't owe him.  He did this to a mentally and physically disabled senior citizen who is a vulnerable adult.

### City of Bloomington

20.    The City of Bloomington Environmental Health Division received a complaint on August 19, 2021 from either Bob Larson, on-site property manager or Andrew Akins, an owner/operator of the complex that Plaintiff was a hoarder and had a fly infestation and strong odors emanating from her apartment into the hallway so that her neighbors could smell it.  This was substantially false, although Plaintiff has too many personal items in her apartment and hoards/collects things, Plaintiff has never had smells or fly infestations.    This falsified report prompted an inspection by the City of Bloomington.

21.    On August 26, 2021 at approximately 1:00 pm, Plaintiff was terrorized and traumatized when Shannon Rohrer, Annmarie Williams, and Lisa Schroeder Olson from the City of Bloomington pounded on Plaintiff's door for about 15-30 minutes and repeatedly yelled City of Bloomington, as this visit to inspect Plaintiff's apartment was unannounced and no contact to Plaintiff from the City of Bloomington prior to this was even attempted.  Plaintiff was shell-shocked, very startled and terrified and Plaintiff already has PTSD.  The report stated that Plaintiff had "some special needs", but no

10

attempt was made beforehand to contact Plaintiff to find out how they could accommodate those special needs or to find out what they were.

22.     Plaintiff frantically and in tears called the City to find out why they came to her door and she was given information that a complaint due to hoarding, fly infestation and strong odors from her apartment had been filed against her.  Plaintiff had several phone conversations with the department and Karla Henderson, the Director of Community Development.  Plaintiff later called the inspections department and inquired about inspections and was told that people were allowed appointments for inspections and no inspections were unannounced.

23.     The inspectors found no evidence of any odors or flies around Plaintiff's apartment and the complaint was dismissed/case closed on August 31, 2021.  If there was any fly infestation at all, it likely came from a hole in the wall next to the back door where it appears there are insect eggs and rodent tunnels that the landlord failed to maintain, not Plaintiff's apartment.

24.     Plaintiff was treated like a criminal instead of a person with mental and physical disabilities, including a hoarding disability, as is included under the FHA, when they showed up at her door unannounced.  They belittled, made fun of and stereotyped Plaintiff's disability by calling her apartment a "GUD", which is their euphemism for gross unsanitary dwelling, before they had even seen it.  They did not allow for Plaintiff to have knowledge or input on any inspection time.  They treated Plaintiff in a very dismissive, hostile and dehumanizing manner.  They did not allow Plaintiff the ability to ask for any reasonable accommodations, when they showed up at Plaintiff's door

unannounced.  Plaintiff has had the reasonable accommodation of having, needing and requiring appointments for all visits to her home for the last 20 or so years supported by medical documentation, because Plaintiff gets easily startled and very anxious when she has visitors due to her disabilities.  Defendants humiliated Plaintiff in front of her neighbors by pounding on her door and yelling repeatedly City of Bloomington.  The City of Bloomington, by their discrimination of Plaintiff, has caused Plaintiff severe emotional distress and exacerbation of physical and mental symptoms, including PTSD, nightmares, shaking, crying, loss of self-esteem, among other things.

## IV.   LEGAL CLAIMS

### Disability Discrimination under the Fair Housing Act and the MHRA

25.     The federal Fair Housing Act (FHA) prohibits discrimination in housing practices on the basis of protected class status, including race, disability, familial status, and national origin. 42 U.S.C. § 3604. The Minnesota Human Rights Act (MHRA) prohibits discrimination in substantially the same manner.  In the course of engaging in a series of actions designed to discriminate against Plaintiff on the basis of her disability, Defendants have treated Plaintiff differently in the following ways.

### City of Bloomington

26.     The allegations in this complaint are hereby re-alleged and incorporated by reference.

27.     The City of Bloomington Environmental Health Department discriminated against Plaintiff by treating Plaintiff differently and less favorably in the manner of services provided to her on account of her physical, mental and hoarding disabilities.

The City of Bloomington Inspections Department of Environmental Health did not contact Plaintiff directly in any manner to inform her of an inspection and did not allow Plaintiff any input on or allow her to schedule the inspection.  In contrast for all other kinds of inspections, for people without hoarding disabilities, they contact or directly communicate with non-disabled people and allow them notice and input on scheduling of inspections.  They do not just show up unannounced for inspections.  Plaintiff was treated very disrespectfully and as though she was a criminal at times during the entire process, instead of someone with a disability.

### Bloomington HRA

28.     The allegations in this complaint are hereby re-alleged and incorporated by reference.

29.     The Bloomington HRA discriminated against Plaintiff in many ways by refusing to grant extensions of time for the Housing Choice Voucher inspection that Plaintiff needed as a reasonable accommodation for her disabilities.  They sometimes granted accommodations, but these accommodations were to their liking and much of the time did not help Plaintiff.   The Bloomington HRA refused to pay Plaintiff's rental subsidy for many months, even when the HRA had irrefutable proof that under state and federal law and HUD rules, that they owed it and were obligated to pay it.  The HRA illegally denied/reduced Plaintiff's services of the rental subsidy on account of Plaintiff needing reasonable accommodation for her disability.

30.     Bloomington HRA also discriminated when they overcharged Plaintiff for her portion of the rent by unlawfully charging her 30% of her inheritance and treated

13

Plaintiff differently and less favorably than non-disabled families within the Housing Choice Voucher Program. Plaintiff was forced to pay approximately 30% more in rent since 2016 than her non-disabled counterparts in the program who received inheritances in a lump sum. Plaintiff was unable to receive her inheritance in a lump sum due to her disability as she has difficulty managing money and has had a rep payee for about 25 years as a result. Bloomington overcharged Plaintiff by approximately $6,000 and this was very distressing and Plaintiff desperately needed that money to live on and pay for needed items, like car repairs and a recliner for her painful, swollen legs. Bloomington has refused to refund the money and repeatedly kept charging Plaintiff. Bloomington forced Plaintiff to pay the extra money and Plaintiff would have lost her housing had she refused.

31.     Plaintiff asked as a reasonable accommodation for Defendants to take the things off her door that they unlawfully posted because it was very distressing to Plaintiff and she was in the hospital and unable to do it herself, as she was not allowed to leave. Plaintiff was disabled at the time and was a vulnerable adult/senior. Defendants refused and the items were posted on her door for 3 weeks for all of her neighbors to see and read.

32.     Bloomington HRA treated Plaintiff less favorably when they posted private information on her door after they knew she was in the hospital and not home. The HRA intentionally violated privacy laws to discriminate and retaliate against Plaintiff because Plaintiff opposed their illegal actions in writing to the HRA and the HRA was aware that she had complained to HUD.

### Premier Properties

33.     The allegations in this complaint are hereby re-alleged and incorporated by reference.

34.     Defendant Premier Properties discriminated by refusing to reasonably accommodate Plaintiff in the following ways:  by refusing reasonable accommodations with reference to scheduling repairs, by refusing another storage locker as a reasonable accommodation, and by refusing or waiting too long to reasonably accommodate Plaintiff with a garage, by treating Plaintiff differently than non-disabled tenants because they received garages much quicker than Plaintiff as Plaintiff waited for 6 years, while many new move-ins received a garage either immediately or much sooner.  Plaintiff was apparently placed on a perpetual waiting list and never moved up from 3rd place for a garage.

35.     Defendant also failed to reasonably accommodate Plaintiff during covid, when he wanted to do a fuse box change out for his own benefit to save money on his insurance rates.  Plaintiff was harassed repeatedly for at least 9 months.

36.     As a result of Defendants' actions, Plaintiff has suffered and continues to suffer severe emotional distress, severe depression, crying spells, weight gain, heart palpitations and pain from the stress, exacerbation of her leg pain and swelling, humiliation, fear, panic, shock and disbelief, loss of self-esteem, loss of interest and loss of ambition, among other things.  Plaintiff also was so despondent and depressed that she needed to be hospitalized for three weeks as a result of Defendants' actions.

### Retaliation and other Prohibited Conduct under the FHA and the MHRA

37.     The allegations in this complaint are hereby re-alleged and incorporated by reference.

38.     The federal Fair Housing Act prohibits retaliation against any person because that person has made a complaint, testified, assisted or participated in any manner in a proceeding under the Fair Housing Act.   42 U.S.C. § 3617, 24 C.F.R. § 100.400.   Similarly, it is unlawful to threaten, interfere, coerce, and intimidate against any protected class person in their assertions of rights to be treated equally with other tenants at the property and in connection with the rental and enjoyment of their housing rights and dwelling.

39.     Defendants were aware that Plaintiff was opposing their discriminatory housing actions.

### Premier Properties

40.     Defendant Premier Properties retaliated against Plaintiff when they intentionally filed a substantially false report against Plaintiff on August 19, 2021 and again when they didn't tell Plaintiff about the inspection and intentionally created the situation where Plaintiff would get a surprise, unannounced inspection.   They were angry about the delay Plaintiff caused them on the fuse box change outs, because due to covid, Plaintiff needed reasonable accommodations for her disabilities and status as a high risk person for covid.   Plaintiff also informed them that she had filed a HUD charge just before they filed their false report against Plaintiff and this led to their false reporting on Plaintiff to the City of Bloomington.

### Bloomington HRA

41.     The allegations in this complaint are hereby re-alleged and incorporated by reference.

42.     Defendant Bloomington HRA retaliated and harassed Plaintiff in numerous ways.

43.     As a result of Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress, crying spells, weight gain, heart palpitations from the stress, humiliation, fear, panic and nausea, among other things.  Plaintiff also was so despondent that she overdosed on medication and tried to harm/kill herself.

### Breach of Contract

44.     The allegations in this complaint are hereby re-alleged and incorporated by reference.

### Violation of MN Covenants of Quiet Enjoyment of the Premises

45.     The allegations in this complaint are hereby re-allege and incorporated by reference.

46.     As a result of Defendants' actions, Plaintiff has suffered monetary damages and severe emotional distress, among other things.

### Privacy Violations

47.     The allegations in this complaint are hereby re-alleged and incorporated by reference.

48.     Defendant Bloomington HRA has invaded Plaintiff's privacy rights and confidentiality by posting private HRA/housing subsidy information on Plaintiff's door

17

and leaving it in plain sight and open for all of Plaintiff's neighbors and anyone else walking by to see and read.

49.     In publishing and disseminating Plaintiff's private housing subsidy and other private information in order to hurt, insult, belittle, harass, discriminate and retaliate against Plaintiff, Defendants have invaded Plaintiff's privacy rights.   There was no legitimate, non-discriminatory non-retaliatory justification for this severe breach of Plaintiff's data privacy.   Furthermore, Defendant Bloomington HRA published this information to other people without Plaintiff's permission or authorization and Plaintiff begged them to take it down because she was in the hospital and would not be home for a long while.

50.     This has greatly exacerbated Plaintiff's physical and mental health symptoms.   This has caused Plaintiff heart pain and palpitations, this has caused severe paranoia, anger, severe emotional distress, crying spells, weight gain, heart palpitations from the stress, humiliation, fear, panic, among other things.

### Negligence

### Defendant City of Bloomington

51.     The allegations in this complaint are hereby re-alleged and incorporated by reference.

52.     Defendants willfully, negligently, maliciously, recklessly, wantonly and knowingly refused to contact Plaintiff with a high degree of probability that it would result in a surprise, unannounced intrusion into Plaintiff's privacy and would result in making Plaintiff terrified, traumatized and lose the security and safety of her own home.

18

53.     Defendant City of Bloomington's Environmental Health Division acted negligently, recklessly, intentionally, willfully, maliciously and wantonly when they showed up at Plaintiff's door without any attempt to personally notify her of an inspection.   They knew that Plaintiff had "special needs" and may need reasonable accommodations for the visit.   Had they taken even minimal steps to do so, Plaintiff could have been spared the severe emotional trauma and humiliation that ensued due to their actions.

### Intentional Infliction of Emotional Distress

### Defendant City of Bloomington

54.     The allegations in this complaint are hereby re-alleged and incorporated by reference.

55.     Defendant City of Bloomington and its Environmental Health Division acted in an extreme and outrageous manner and in an intentional and reckless manner and their actions would have been utterly intolerable to most people in society.   Their actions caused Plaintiff severe emotional distress.

56.     The City of Bloomington knew or should have known that Plaintiff had PTSD and that coming to her door in that manner would have been utterly intolerable to her.   The City of Bloomington knew or should have known that Plaintiff was an extremely vulnerable person and that she would have been particularly susceptible to extreme emotional distress from showing up at her apartment unannounced, pounding on her door demanding to be let it and yelling City of Bloomington for 15-30 minutes.

Defendant City of Bloomington knew that Plaintiff had special needs and didn't even bother to find out what they were before they traumatized and terrorized Plaintiff.

57.     Defendant City of Bloomington caused severe panic, extreme emotional distress, shock and disbelief, severe humiliation, months of fear to leave apartment, heart arrhythmias and pain, exacerbations of physical pain and swelling to legs, nightmares and shaking, among other things, to Plaintiff, a vulnerable adult/senior with mental and physical disabilities.  Defendant's negligence and inhumane treatment of Plaintiff by showing up at Plaintiff's door without prior notice of any kind and pounding on her door and yelling City of Bloomington for 15-30 minutes was meant to intentionally scare and intimidate Plaintiff to open the door and humiliate her in front of her neighbors. Defendant intentionally discriminated against Plaintiff, intentionally belittled, insulted and humiliated Plaintiff because of her disabilities.

58.     The above items each alone and taken in conjunction with one another, caused Plaintiff severe emotional distress.  Each and every act by Defendant listed above and listed in this Complaint was extreme, outrageous, intentional and/or reckless.

59.     As a result of Defendants' actions, Plaintiff has suffered crying spells, she has gained a lot of weight due to severe depression and severe stress resulting from Defendants' actions, she has been hospitalized for three weeks,  she has had heart palpitations/arrythmias and pain from the severe depression and stress, she has had severe panic attacks to where she couldn't speak and had stroke-like symptoms, she has had a worsening of her IBS, she has had shaking and nightmares, she has had severe anger, loss of self-esteem, among many other things.  Defendant's actions exacerbated and caused a

20

hoarding disability and worsened Plaintiff's ability to care for herself and her apartment. Plaintiff has had to increase her normal medication dosage and double her doctor visits as a direct result of Defendants' actions.

## Bloomington HRA

60.     Defendant Bloomington HRA acted in an extreme and outrageous manner and in an intentional and reckless manner and their actions would have been utterly intolerable to most people in society.   Their actions caused Plaintiff severe emotional distress.    The HRA knew that Plaintiff was a very vulnerable adult/senior, had a representative payee for her SSDI and had mental and physical disabilities.

61.     Bloomington HRA knew that Plaintiff had PTSD, in particular with fears of losing her housing and going homeless, yet they caused that scenario for Plaintiff deliberately by illegally refusing to pay her housing subsidy.  They kept this up even after Plaintiff provided them with statutes, rules and laws showing the HRA that it was undeniably illegal not to pay her subsidy.  Bloomington refused to pay Plaintiff's rent even when they knew that Plaintiff was receiving eviction notices and would be evicted. Bloomington did this intentionally so that Plaintiff would be evicted and lose her housing subsidy.   Bloomington HRA also refused additional reasonable accommodations for extensions of time for Plaintiff's inspection so that Plaintiff could receive necessary medical treatment.  Aarica Coleman and Robin Anderson intentionally went to Plaintiff's apartment after Plaintiff emailed that she was in the hospital on a psychiatric hold and could not leave.  Robin and/or Aarica posted a failed inspection report and a letter from the HRA on Plaintiff's door knowing that Plaintiff would not be home for a long time to

receive it and then emailed Plaintiff these documents and a picture of the documents posted on her door, knowing that Plaintiff was in the hospital and was a vulnerable adult and had physical and emotional injuries due to their conduct.  This upset Plaintiff immensely and added severe stress and trauma to an already traumatic experience.  They refused to remove the documents from Plaintiff's door and demanded an inspection for the next day, even though they knew Plaintiff was not able to leave the hospital and on a hold.  The HRA posted private data on Plaintiff's door in retaliation for her discrimination and retaliation complaints and shortly after Plaintiff told them that she would be afraid to receive something posted on her door.  Bloomington HRA knew that Plaintiff was an extremely vulnerable person and that she was particularly susceptible to extreme emotional distress from discrimination, retaliation, posting of private information on her door and the refusal to pay her Housing Assistance Payments to intentionally cause her to be evicted and lose her housing subsidy.

62.     Defendant Bloomington HRA caused severe panic, extreme emotional distress, shock and disbelief, severe humiliation, months, heart arrhythmias and pain, exacerbations of physical pain and swelling to legs, nightmares and shaking, loss of self-esteem, among other things, to Plaintiff, a vulnerable adult/senior with mental and physical disabilities.  Defendant's inhumane treatment of Plaintiff by the above actions, in addition to other acts, were intentional and illegal.  Defendant intentionally discriminated and retaliated against Plaintiff, intentionally belittled, insulted and humiliated Plaintiff because of her disabilities.

63.     The above items each alone and taken in conjunction with one another, caused Plaintiff severe emotional distress.  Each and every act by Defendant listed above and listed in this Complaint was extreme, outrageous, intentional and/or reckless.

64.     As a result of Defendants' and Aarica Coleman's actions, Plaintiff has suffered crying spells, she has gained a lot of weight due to severe depression and severe stress resulting from Defendants' actions, she has been hospitalized for three weeks, she has had heart palpitations/arrythmias and pain from the severe depression and stress, she has had severe panic attacks to where she couldn't speak and had stroke-like symptoms, she has had a worsening of her IBS, she has had shaking and nightmares, she has had severe anger, among many other things.  Plaintiff has had to increase her normal medication dosage and double her doctor visits as a direct result of Defendants' actions.

### Premier Properties

65.     The allegations in this complaint are hereby re-alleged and incorporated by reference.

66.     Defendant Premier Properties acted in an extreme and outrageous manner and in an intentional and reckless manner and their actions would have been utterly intolerable to most people in society.  Their actions caused Plaintiff severe emotional distress.

67.     Premier Properties, Andrew Akins, Petra Larson and Bob Larson knew that Plaintiff had "special needs" and physical and mental disabilities and that substantially falsely reporting Plaintiff to the City of Bloomington for hoarding, infestation of flies and severe odor without notifying Plaintiff and causing three people from the City of

23

Bloomington to make a surprise visit to her apartment for a surprise inspection would have been utterly intolerable to her.   Andrew Akins has refused to reasonably accommodate Plaintiff's disabilities and repeatedly threatened, over many months, to evict Plaintiff unless she paid him money/rent that she did not owe him.  Mr. Akins threatened to take away Plaintiff's home and did not let up until Plaintiff was forced to pay him money she never owed him.  Mr. Akins also falsely claimed that Plaintiff owed him the money and falsely portrayed Plaintiff as a dead-beat renter and a check bouncer. Premier Properties and the listed people in this paragraph knew that Plaintiff was an extremely vulnerable person who was particularly susceptible to emotional distress. Further, they knew that Plaintiff was on SSDI and was a senior.

68.    Defendant Premier Properties caused severe panic, extreme emotional distress, shock and disbelief, severe humiliation, months of fear to leave apartment, heart arrhythmias and pain, exacerbations of physical pain and swelling to legs, nightmares and shaking, loss of self-esteem, among other things, to Plaintiff, a vulnerable adult with mental and physical disabilities.  Defendant's negligence and inhumane treatment of Plaintiff by showing up at Plaintiff's door without prior notice of any kind and pounding on her door yelling City of Bloomington for 15-30 minutes was meant to intentionally scare and intimidate Plaintiff to open the door and humiliate her in front of her neighbors. Defendant intentionally discriminated against Plaintiff, intentionally and intentionally belittled, insulted and humiliated Plaintiff because of her disability.

69.     The above items each alone and taken in conjunction with one another, caused Plaintiff severe emotional distress.  Each and every act by Defendant listed above and listed in this Complaint was extreme, outrageous, intentional and/or reckless.

70.     As a result of Defendants' actions, Plaintiff has suffered crying spells, she has gained a lot of weight due to severe depression and severe stress resulting from Defendants' actions, she has been hospitalized for three weeks,  she has had heart palpitations/arrythmias and pain from the severe depression and stress, she has had severe panic attacks to where she couldn't speak and had stroke-like symptoms, she has had a worsening of her IBS, she has had shaking and nightmares, she has had severe anger, loss of self-esteem, among many other things.  Plaintiff has had to increase her normal medication dosage and double her doctor visits as a direct result of Defendants' actions.


## V.     RELIEF SOUGHT

71.   Plaintiff seeks the following damages:

   a)    Issuing a declaratory judgment in favor of Plaintiff;

   b)    Declaring that Defendants have engaged in discrimination and retaliation/reprisal in violation of the FHA and the Minnesota Human Rights Act;

   c)    Awarding compensatory, statutory, consequential, and other damages to Plaintiff;

   d)    Awarding Plaintiff interest and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

   e)    Awarding costs and attorney fees to Plaintiff pursuant to 42 U.S.C. § 3613; and

f)      Granting such further relief, like punitive damages or any other damages, as the Court may deem just.


Dated:   8/26/23                        _Claire J. Lee_____

                                        Claire J.  Lee
                                        10101 Lyndale Ave So
                                        Apt 219
                                        Bloomington, MN  55420
                                        (612)402-9206 (Cell)
                                        Claire.1957@yahoo.com

26