23cv2652

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

RECEIVED

NOV 28 2023

CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

Claire J. Lee,

**Plaintiff,**

V.

City of Bloomington, Bloomington HRA,
Premier Properties, Andrew Akins,
and the United States Department of
Housing & Urban Development (HUD).

**Defendants.**

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

This case is mainly a Housing discrimination case and is about a Housing Authority and Landlord who ignored and violated well established policies, laws, HUD guidance and statutes to intentionally inflict about as much pain and stress as is possible onto Plaintiff, a severely disabled senior, who is a vulnerable adult. Plaintiff was abused, harassed, discriminated against, retaliated against, coerced, intimidated, and threatened often and repeatedly by the Housing Authority and her Landlord over a series of many months and years often times for behavior and actions she was not responsible for and on account of her needing and requesting reasonable accommodations for her disabilities or just for having disabilities.

Since that time, Plaintiff has done research into some cases regarding Housing Authorities and the amount of abuse inflicted on vulnerable families is shocking and this is just from a local standpoint. There does not seem to be any incentive not to abuse families as there are no consequences for it from HUD. It appears that all HUD is concerned with is following the rules of the program, not the harassment and abuse committed by Housing Authority employees. The families in the Housing Choice Voucher program are almost all vulnerable to some degree



SCANNED
NOV 28 2023 AL
U.S. DISTRICT COURT MPLS

either by poverty, race, disability or age and the last thing they need is to be abused by Housing Authorities, when they need stable housing the most. Most of the cases involve only the Housing Authority or Landlord that make it to court, but Plaintiff has gotten abused by both the Housing Authority and her Landlord, which has been too hard on Plaintiff and has caused permanent damage. In one case Plaintiff examined, a local Housing Authority harassed, threatened and took unwarranted punitive actions against a disabled married couple in their 80's and the husband had just undergone heart surgery and may have been in a wheelchair. The Housing Authority falsely accused them of lying on their application to get a 2nd bedroom and rescinded their voucher, spread lies and rumors about them, videotaped and took pictures of them, spied on them, and defamed them, among other things. The couple had to find a lawyer to sue them (in their 80's when they needed stable housing and to live a stress-free life for the few remaining years they had left) and by the time they got to court, the Housing Authority abandoned their case. The case was so false and fabricated that they didn't dare to defend it in court and this district court noted that in the opinion. If this couple had not found an attorney or anyone to help them on the case, they would have gone homeless and lost their voucher, because of the Housing Authority's lies. In another case, a disabled mother and her disabled child were thrown out of their housing and lost their voucher over a minor violation of holding over and the mother had asked for reasonable accommodation, which MN law recognizes as a defense in eviction actions and holding over is sometimes necessary, particularly when the eviction or non-renewal is retaliatory; however, under the HCV program, it is considered sufficient cause for termination of the voucher and of the program. The Housing Authority should have allowed the mother to keep her voucher, because the mother's disability prevented her from timely asking for the accommodation. The Housing Authorities face no consequences from HUD for fabricating cases to terminate someone from the program, for intentionally overcharging families, or for abusing families in the HCV programs. Most often, it is the Housing Authority that has the attorney in court or in hearings, not the family, and so it is a very lopsided and unfair system. Those most disabled and sick most often don't have the energy to fight to keep their home or otherwise defend against unwarranted actions in a hearing or a court, so the Housing Authorities can and do win most of their cases, even those that are fabricated or exaggerated under specious grounds. When cases involve discrimination, HUD should and must implement consequences for Housing Authorities and Landlords, as HUD is the agency responsible for rooting it out.

2

The Housing Authority in this case, Bloomington HRA, has engaged in a continuing series of harassment and retaliatory and discriminatory acts against Plaintiff which started even before Plaintiff moved to Bloomington and continues to this day. Bloomington HRA refused to reasonably accommodate Plaintiff when they refused Plaintiff's voucher request for a second bedroom that Plaintiff needed for her disability and denied Plaintiff the apartment she had worked so hard to find and then told Premier Properties they would not approve the apartment, all before even engaging in any interactive process with Plaintiff. Instead of helping and prioritizing services for Plaintiff, like they were supposed to do due to her being involuntarily displaced from her housing in Richfield, Bloomington HRA actively worked to deny Plaintiff housing and make her homeless, even after Richfield had already approved the voucher and reasonable accommodation that Bloomington subsequently denied. The only reason Bloomington HRA didn't succeed is because Plaintiff and the State of Minnesota contacted HUD and HUD locally intervened and told Bloomington that they would be looking at a HUD complaint/charge and only then did Bloomington allow Plaintiff housing. After doing all that and causing a delay in Plaintiff's move-in and causing Plaintiff a suicide attempt and PTSD, Bloomington HRA then denied Plaintiff rental assistance for the month that Plaintiff moved in, just because it wasn't done on the first of the month. They had the ability to pay the rent as a reasonable accommodation, particularly since they caused and/or contributed to the two week delay in Plaintiff's moving, but they refused. Plaintiff was told this at the last minute and so then Plaintiff had to apply for emergency assistance to pay the rent that Bloomington HRA should have paid and worry whether it would be granted and find help to move, all after suffering a severe nervous breakdown and suicide attempt caused by Bloomington HRA. Bloomington HRA also refused to reasonably accommodate Plaintiff's disabilities in connection with the inspection of her apartment and in other ways and deliberately made Plaintiff undergo Herculean efforts to get reasonable accommodation and then they denied most of them. Bloomington HRA also intentionally violated Plaintiff's privacy rights and engaged in several acts of conversion of Plaintiff's property. In refusing to pay the Housing Assistance Payment (HAP) of Plaintiff's rent to punish Plaintiff for her hoarding disability due to her needing and requesting reasonable accommodations for her disabilities and out of retaliation for her having complained about discrimination and by continually harassing, retaliating and discriminating against Plaintiff throughout her tenancy, they created a hostile environment for Plaintiff to live in and

3

exacerbated Plaintiff's disabilities to the extent that she was unable to pass her inspection by exacerbating her hoarding condition. They also caused and/or contributed to Plaintiff's Landlord to threaten and begin the eviction process against Plaintiff, for non-payment of the Housing Assistance Payment (HAP) of which Plaintiff was never responsible for and cannot be responsible for under the statute and rules of the program. Bloomington HRA was aware Plaintiff was receiving eviction notices for several months and Plaintiff sent them the HUD rules and statutes that disallowed abatement of the HAP for tenant caused inspection deficiencies, but Bloomington HRA ignored Plaintiff's begging for them to pay the rent. Bloomington HRA also has intentionally overcharged Plaintiff for approximately six years by increasing her tenant portion of the rent, by charging her 30% of her inheritance when they were aware that Plaintiff needed a trust/money manager for her inheritance, due to her mental disabilities, as she also required a representative payee for her SSDI management. Plaintiff has provided the information to Bloomington HRA and their attorney that they requested to prove that it is an inheritance so that she could be reimbursed. Not only has Bloomington HRA refused reimbursement, but at recertification for her new 2022 rent, Bloomington HRA again proceeded to charge Plaintiff the 30% of her inheritance. Bloomington HRA has held a grudge against Plaintiff since she ported her voucher, because she reported them to HUD for discrimination and any time they could make things hard on Plaintiff, make Plaintiff pay extra money or retaliate, they have done so. They have caused Plaintiff extreme prolonged emotional distress, they have exacerbated a small hoarding issue into a much more serious hoarding disability, and caused her permanent damages. They greatly exacerbated Plaintiff's hoarding problems and then punished Plaintiff for her hoarding disability when she couldn't immediately clean up her apartment by withholding the HAP payments, during which time they were causing Plaintiff's Landlord to evict Plantiff for the HAP payments that Bloomington HRA owed and causing Plaintiff to be more disabled from the constant threats from Bloomington and her Landlord and refusing to come up with a reasonable plan to clean up her apartment because Plaintiff now needed more time due to the stress of continuously being threatened with eviction. They knew that Plaintiff has PTSD specifically related to Bloomington HRA's denial of her apartment and of going homeless and that she suffered a suicide attempt as a result, yet Bloomington was intentionally causing Plaintiff to be evicted, by purposely and without legal justification, refusing to pay her HAP subsidy payments for several months. In addition, Bloomington HRA knew Plaintiff had a

4

hoarding problem in her apartment, because in August 2021, when the Landlord's hoarding complaint against Plaintiff was dismissed, Community Development Director Karla Henderson (Aarica Coleman's boss) told Bloomington HRA to help Plaintiff with it; however, Plaintiff never heard from anyone there or received any help from Bloomington HRA and they negligently and/or intentionally failed to follow up on it. Bloomington HRA then notified Plaintiff of inspection in the spring of 2022 (after having no inspections in 2020 and 2021 due to covid for any HCV families) and demanded that Plaintiff must have it all cleaned up within only a few short weeks, when they knew that Plaintiff was 65 years old and severely disabled. It is very unrealistic to require that someone with a hoarding disability must clean up their home in a couple of weeks, particularly when there is no health or safety threat and when the person is a disabled senior, even in the HCV program. There needs to be a mandatory performance improvement plan put into place for hoarding disabilities when inspections fail with realistic expectations that allow for setbacks that would allow the person to work on it over the course of many months or even a year, while monitoring to see that improvements are being made. Instead, Plaintiff was punished and continuously threatened by Bloomington HRA with the loss of her voucher and had her HAP payments withheld and was pressured to get it done, so that she could get her HAP payments reinstated. They conditioned Plaintiff's HAP payments on her disability -- HAP payments that were never allowed to be abated. Nobody deserves that kind of treatment when they can't perfectly follow the rules of the program due to their disability and when the reason they can't follow the rules is because the Housing Authority has constantly harassed and discriminated against them since they ported their voucher and moved to the City. Some people drink and do drugs to drown their emotional pain, Plaintiff eats and hoards/buy things to feel better temporarily. When Bloomington HRA denied Plaintiff the apartment, especially after Plaintiff had worked so hard to find the apartment, port her voucher and get the accommodation voucher request approved by two Housing Authorities (after being involuntarily displaced in the first place and thrown out of that home), not only was Plaintiff panicked and devastated because she had no housing and would need to live in her car, but it made Plaintiff feel worthless, extremely depressed, lifeless and as though people believed she was undeserving of a home and Plaintiff clearly understood that people were more than willing and satisfied to cause her, a disabled senior, to go homeless and this was crushing to Plaintiff and still is and Plaintiff has never gotten over that or the fears and trauma resulting from it.

The City of Bloomington, Community Development Department/Inspections Department, violated Plaintiff's civil rights when they discriminated against her by showing up unannounced for an inspection as a result of a substantially false complaint filed by Plaintiff's Landlord for hoarding, fly infestation and odor so bad that it emanated down the common hallway to other people's apartments. Plaintiff's apartment did not have a fly infestation or any odors. The City of Bloomington failed and refused to even give Plaintiff the consideration of any prior oral or written notification so that she could request reasonable accommodations (no unannounced visits, prior notice and an appointment, etc. – accommodations that Plaintiff has had in her housing supported by medical documentation for more than 20 years) and failed and refused to allow Plaintiff to have any input on an appointment time by treating her differently and more harshly due to her hoarding disability than other non-disabled persons as related to other inspections, because they are allowed appointments, prior notice and direct written or oral communication. There was no legitimate reason not to notify Plaintiff directly unless they wanted to catch Plaintiff in the act of hoarding and surprise Plaintiff, so that she might be more intimidated to open the door. This is certainly not how they handle other inspections. The City of Bloomington failed to contact Plaintiff, knowing that Plaintiff had "special needs" noted on the report and would likely require reasonable accommodations. They clearly do not have respect or believe that people who have hoarding disabilities have rights, because if they did, they would notify both the Landlord and the tenant and speak to the tenant before inspection, treat them like they are a person with a disability and someone deserving of respect and dignity. Instead, they treated Plaintiff as just a gross, disgusting problem by showing up unannounced and pounding on the door excessively and loud to intimidate Plaintiff to open the door. They described Plaintiff in the complaint filed by the Landlord, as a possible "GUD", which is their code for "gross unsanitary dwelling" when they had never met Plaintiff or even spoken to her. They abused their power to intimidate, humiliate and scare Plaintiff to open the door by excessively pounding on her door and yelling "City of Bloomington" outside her door for 15-30 minutes, so all of her neighbors could hear. This terrified and traumatized Plaintiff, as Plaintiff has PTSD regarding excessive and intrusive extreme fears and nightmares of losing her housing and going homeless. The City of Bloomington executive office, including the City Attorney Melissa Manderschied and Karla Henderson, Director of Community Development, were also aware of this discrimination as Plaintiff contacted both of them, but they allowed further

discrimination of Plaintiff and other illegal acts by the Bloomington HRA as Plaintiff sent them emails as the events unfolded and they did nothing to intervene and just allowed Bloomington employees to continue their harassment, retaliation and discrimination of Plaintiff.

The Landlord, Premier Properties, owned and operated by Andrew Akins, engaged in a continuing series of discriminatory and retaliatory acts and harassment against Plaintiff that caused Plaintiff extreme distress and created a very hostile environment for Plaintiff to live in and caused Plaintiff greatly diminished quiet enjoyment of her home. In 2016, Plaintiff was first denied the apartment that she had a signed lease on even though she begged the Landlord not to re-list it. Plaintiff received an email from the Landlord that they were re-renting her apartment while she was in the hospital from a suicide attempt. From 2016 to approximately 2019, there was a tenant who was close friends of Petra Larson, on-site property manager, who harassed and put Plaintiff down on numerous occasions and belittled and insulted Plaintiff for her hoarding disability. Petra came into Plaintiff's apartment on the 2nd day of move-in to show Plaintiff how to turn on the shower and commented how many possessions Plaintiff had in a disgusted tone of voice, while all of her things were still in boxes. Plaintiff then saw Petra going into her friend's apartment (her friend worked at the post office and had the apartment across the hall from the storage lockers) on numerous occasions and Plaintiff saw them together in the common areas and realized they were friends and had been gossiping about her. Her friend continually insulted Plaintiff with phrases such as "why do you have so much junk?" even though she never saw Plaintiff's belongings. Other times, she would say "where do you put all that junk" or like phrases. Or when Plaintiff was walking to her car, she would say to Plaintiff, "going to another estate sale to buy more crap?" At least 20 times over 3 or so years, Plaintiff was subjected to this unwelcome behavior and comments, but Plaintiff did not respond back to her. Other people heard this also. Petra and her friend had an unhealthy and unwelcome obsession in Plaintiff's hoarding/buying activities and Plaintiff was harassed for it, which also exacerbated Plaintiff's hoarding, because it made Plaintiff feel bad that her possessions were thought of and talked about as junk, when Plaintiff liked her things and bought as nice of things that she could afford and things that reminded her of her childhood and Plaintiff did it to feel better. Most of the things Plaintiff bought were to decorate her apartment, sell on Ebay when she got her business up and running and some vintage dolls that Plaintiff enjoyed restoring and fixing up as a hobby for resale or collecting. The more stress and ridicule Plaintiff was subjected to, generally the

more Plaintiff bought and hoarded. Plaintiff knew she was being put down for her disability and that really hurt Plaintiff, especially since she was also embarrassed about it. Plaintiff wasn't doing anything to them and Plaintiff just wanted to be left alone. Plaintiff is very emotionally attached to her things, since she doesn't have pets or family in her life. In 2020, during the covid lockdown and pandemic, Andrew Akins forced a fuse box change out at many of his properties so that he could save money on his insurance. Many of his renters were vulnerable due to race, age and disability, including Plaintiff, who could not just find a different place to live or even stay, to avoid having this work done and being exposed to a deadly virus. Furthermore, by living in a multi-family dwelling, the virus had an even greater chance of spreading with worker's going door to door, and Plaintiff was especially vulnerable also due to her poverty, because those who could afford a home of their own were not forced to risk their lives to have this repair or any repair. This went against federal lockdown orders and the MN Governor Executive Orders, which generally stated that no non-essential work or activities be done in order to slow the spread of the covid virus. Plaintiff was at high risk for bad outcomes if she ever got covid, due to her age, obesity and disabilities and according to the guidance, she was to stay home as much as possible and have as few visitors as possible, particularly workmen who were going door to door and spending several hours in her apartment as this was a good way to spread the virus. Plaintiff was badgered, intimidated and harassed for at least 9 months about this repair, even when she was at Walgreens buying a thermometer, when she was in a hospital with a pacemaker infection and removal due to the infection and while at her home, including phone calls and pounding on her door. Plaintiff asked for reasonable accommodation to delay this work in Plaintiff's apartment and to leave her alone as it was exacerbating her disabilities, but Andrew Akins and Petra Larson still badgered and harassed her. Plaintiff also asked for reasonable accommodations to have appointments for all repairs, no unannounced visits and a two week notice for all repairs that are not emergencies; however, they have denied this. Plaintiff also asked for reasonable accommodation for a garage when she signed her initial lease with on-site manager Petra Larson, but instead of granting the request in a timely manner, Petra instead gave garages to new move-ins, while Plaintiff was denied one for more than six years. Plaintiff needed a garage both for her physical disabilities, to keep her car out of the cold, snow and sun, and because of her hoarding disability to store belongings so that she could have room to organize her apartment, especially for passing inspections and general livability in her apartment

to have more room. Premier Properties also violated the False Claims Act when they violated HUD rules and federal statutes concerning the Housing Choice Voucher (HCV) program, formerly known as Section 8, and they were not allowed to threaten, coerce, intimidate, extort or accept payment from Plaintiff for any rent above her agreed upon rent as established under contract with the Housing Authority. Andrew Akins, an owner and operator of Premier Properties, extorted HAP payments from Plaintiff by threatening her with eviction unless she paid them, rent that was in addition to her tenant portion of the rent and rent that he knew Plaintiff did not owe, over the course of at least 4 months in 2022. Defendant Andrew Akins defamed Plaintiff at least two times in connection with this payment and attempted to convince others that Plaintiff was a deadbeat renter who did not pay her rent, even though Plaintiff had never missed a rent payment.

Defendant United States Department of Housing & Urban Development (HUD) have policies that need to be more carefully crafted so that Housing Authorities can't intentionally or otherwise take advantage of or abuse vulnerable families/persons. (1) Some of HUD's policies have the discriminatory or disparate impact of harming disabled groups more than it harms other groups and there needs to be detailed written guidance for those situations, such as for inheritances put into trusts for disabled persons who need someone to manage their money and because of their disability they can't receive their inheritance in a lump sum and manage it themselves. The policy discriminates against people with mental and developmental disabilities and also neurological and brain injured people most, because most people who need inheritances put into a trust for management of their money are disabled people and other non-disabled groups do not need this and can get their inheritances in a lump sum and not be charged 30% of their inheritance. It penalizes and punishes people with disabilities more harshly, because it causes them to lose 30% of their inheritance and in contrast, non-disabled people who are able to get their inheritance in a lump sum are not charged the 30% penalty, as the money is counted as an asset instead of income like trusts are charged. In Plaintiff's case, she explained to Bloomington HRA why it was discriminatory to do this and even asked for reasonable accommodation for them not to charge her the 30% and not count it as income, but they did it anyway, citing HUD guidance, even though there are two competing rules. One rule says that inheritances are not counted as income and another rule says that trusts are. There needs to be detailed guidance on this particular situation, because Plaintiff has seen other cases on-line where

disabled people with inheritances put into trusts are being wrongly charged 30% and it is discriminatory on its face and it hurts only the most vulnerable of people, who need the money management for their disability. They should not have to be forced to give the HCV program 30% of their inheritance by paying 30% of it as rent, when non-disabled families are allowed to keep their inheritance. (2) HUD's online discrimination form discriminates against disabled persons in that it has a time limit of 45 minutes to complete and a limit of number of characters, making it more difficult and stressful for disabled persons. There also is no counter telling you a running count of characters, until you're over the limit and it just stops all of a sudden, not letting you type, finish or file the complaint. You then have to start deleting whole paragraphs and guess how much to delete and you end up deleting crucial information, because there is a time limit and you start to panic that it will time out. It is entirely unnecessary to have those constraints and this is a very old program that doesn't meet today's computer specs. This discriminates against many people with all kinds of disabilities who cannot complete it in that amount of time and with using so few characters and causes unnecessary stress and results in a much lower quality of complaint and results in complaints being denied by HUD, like Plaintiff's was, as being not written well or complete enough. Plaintiff expected HUD to contact her with any questions they had, but they did not make an adequate attempt on the first set of complaints and Plaintiff refiled and Plaintiff never heard from HUD on her second batch of complaints for these defendants. HUD dismissed her complaints pretty much because they were "swamped" with complaints during and after covid and Plaintiff was never given a chance to answer any questions or offer any further explanation as to her discrimination complaints she filed with HUD against these defendants. (3) HUD must change the rule where they require both the previous HRA and the new HRA to approve a reasonable accommodation regarding a voucher, as it is way too burdensome for disabled people, it is entirely unnecessary and it causes delay and catastrophic problems when one Housing Authority approves the voucher but then the other one does not, especially close to moving time. It can cause a person to go homeless and severe medical problems with the shock of thinking you have a home and then the HRA you ported the voucher to, denies the family the apartment, as in Plaintiff's case. It should just require either the initial HRA or the receiving HRA's approval, not both. 4) HUD's HCV program needs to establish a policy holding Housing Authority employees responsible when they harass, retaliate, discriminate and/or intentionally hurt persons and families receiving benefits through the HCV

program and must hold them accountable and conduct an investigation not only into that particular case, but to find out if it is an isolated case or widespread. The Housing Authorities are given the privilege of administering the HCV program with HUD policies and funding and HUD must hold them to the highest standards of professionalism, humanity and decency and make sure that they are not discriminating, retaliating or harassing program participants. The Housing Authority and/or City responsible for any of these things, needs to be put on probation and if there aren't improvements shown, they may need to replace employees or lose their funding in the HCV program or in other redevelopment programs HUD provides funding for in the particular City. These Housing Authorities need to understand that HUD does not tolerate harassment, retaliation, abuse and discrimination. The City of Bloomington and Bloomington HRA has shown that they will do anything they feel like doing to Plaintiff, in violation of HUD rules, laws and statutes, over and over, because they have not suffered any consequences for it from HUD. This Landlord has not suffered any consequences from HUD for their intentional wrongdoing and violations of HUD rules and statutes.

HUD has also refused to turn over documents that Plaintiff made under a FOIA request from October 6, 2022. Plaintiff asked for records regarding herself and interactions they had with the Bloomington HRA. Although Plaintiff's request may not have been perfect, they could have turned over some of the records, but to date Plaintiff has received none.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343. This action is authorized by 42 U.S.C. § 3613. The Court also has jurisdiction pursuant to 42 U.S.C. § 3601 and § 3604, *et seq.* The Court has supplemental jurisdiction to consider state law claims pursuant to 28 U.S.C. § 1367. Venue is proper as Plaintiff resides in Minnesota and all of the Defendants do business in, have offices in, and are located in Minnesota. Most, if not all, of the actions described herein took place in Minnesota.

## PARTIES

2.     Plaintiff Claire Lee has resided at Lynvilla Apartments at 10101 Lyndale Ave S, Apt 219, Bloomington, MN 55420 since June 2016. Plaintiff is 66 years old, she has mental and physical disabilities and is reliant on Social Security (SS) and her Housing Choice Voucher (HCV), formerly known as Section 8, through Bloomington HRA. (Plaintiff was on SSDI since 1990 until age 66, when the government automatically changes it to SS.)    Plaintiff has severe physical disabilities/problems including heart problems, obesity, and back, knee, leg pain and swelling and mental health disabilities, including severe depression, severe anxiety, panic disorder, obsessive-compulsive disorder, PTSD and hoarding, etc. and they substantially limit one or more major life activities in the areas of interacting with others, thinking, working, personal care and housekeeping, concentrating, mobility and other major life activities. She is, therefore, a qualified person with disabilities under the Fair Housing Act (FHA). Fair Housing Amendments Act (FHAA) and the Minnesota Human Rights Act (MHRA). The same holds true under Section 504 of the Rehabilitation Act and under the Americans with Disabilities Act (ADA).   Plaintiff has also been approved for Metro Mobility on a permanent basis because due to her disabilities, she can't generally take the bus most places due to health problems, mobility issues and mental health and because her car is inoperable and she can't afford to get it fixed.

3.     The stress of being harassed, discriminated against and retaliated against has significantly exacerbated Plaintiff's mental and physical symptoms and significantly exacerbated a smaller hoarding problem where Plaintiff simply collected too many vintage dolls, into a major hoarding disability where Plaintiff could not utilize rooms for their intended purposes and move about comfortably due to the amount of possessions Plaintiff accumulated after Plaintiff moved to Bloomington and experienced harassment, discrimination and retaliation.  Plaintiff has had to

double her normal medication dosage and has had to increase her regular doctor visits from every 3 months to approximately every month. In addition, Plaintiff is on a new medication for severe depression and for her leg pain, both made worse by Defendants' City of Bloomington, Bloomington HRA and Landlord's actions.

4.      Defendant City of Bloomington (Bloomington) has their main offices in the City Hall complex at 1800 W Old Shakopee Rd, Bloomington, MN 55431. The Inspections Department is a division of the Community Development Department within the City of Bloomington. Shannon Rohrer in an Environmental Health supervisor, AnnMarie Williams is an Environmental Health specialist and Lisa Schroeder Olson is a Public Health Nurse, all of whom came to Plaintiff's home unannounced. Karla Henderson is the Community Development Department Director and Melissa Manderschied is the senior attorney for Bloomington, both of whom Plaintiff copied on most of her communications.

5.      Defendant Bloomington HRA (HRA) is located at 1800 W Old Shakopee Rd, Bloomington, MN 55431. Bloomington HRA is a division of the Community Development Department of the City of Bloomington. Although the HRA receives federal funds for its Housing Choice Voucher (HCV) program and operates using those funds, the employees of HRA are City of Bloomington employees and were hired by the City of Bloomington. The HRA further uses City of Bloomington services, such as Bloomington's accounting department for the handling of its disbursements, etc. Bloomington also advertises the HRA as one of its departments through its website and newsletters. Aarica Coleman is the Bloomington HRA Administrator in charge of the HCV program and Robin Anderson works for the HRA recertifying and doing inspections for the HCV program and was the person assigned to Plaintiff's 2022 recertification and inspection.

6.     Defendant Premier Properties (PP), a Minnesota corporation, has its offices at 5416 W 70th St, Edina, MN 55439 and is the current management company/owner of the Lynvilla apartment complex where Plaintiff resides. On information and belief, Andrew Akins is an owner and operator of this complex and he is responsible for making decisions and rules concerning this property. Bob and Petra Larson are the on-site property managers at this complex and they live at this complex and more or less run this property.

7.     Defendant United States Housing & Urban Development (HUD) is a housing and urban development department within the federal government and has their local field office at 212 3rd Ave S, Suite 150, Minneapolis, MN 55401. HUD operates and provides funding for many programs concerning housing. HUD implements, provides funding and makes rules and guidance for the Housing Choice Voucher (HCV) program, formerly known as Section 8, that plaintiff utilizes and needs to pay her rent. Michele K. Smith is the Field Office Director for this area. The Chicago office is the Regional Office for the State of Minnesota and several other Midwest states and where discrimination complaints are sent, filed and decided for this area.

## FACTS

8.     Plaintiff moved into the Lynvilla apartment complex in June of 2016. Plaintiff was a victim of the Crossroad's gentrification sale after having lived at that complex for 20 years. Plaintiff was forced to move and involuntarily displaced from her home because Crossroads' new owners upgraded the property, substantially increased rents and no longer accepted Section 8 vouchers in order to attract a more upscale renter. More than 2000 people were forced to move and find new housing in an already overstressed and inadequate affordable housing crisis. Plaintiff had great difficulty in finding new housing and was forced to move to a new city. Plaintiff had numerous problems porting her voucher from Richfield to Bloomington, including but not limited to, Bloomington HRA denying her the voucher that Richfield HRA had

approved and Bloomington HRA then subsequently denied Plaintiff the apartment that Plaintiff worked so hard to find, as there was already a huge deficit of affordable housing and an even greater reduction in Landlords accepting Section 8 vouchers. Plaintiff was so despondent, devastated, scared, traumatized, depressed and anxious about going homeless in just days and having the apartment taken from her that this resulted in Plaintiff attempting suicide on May 18, 2016, caused by Bloomington HRA as it was the same day Plaintiff received notification that Bloomington denied her voucher and then they contacted Premier Properties to tell them the apartment was denied. In turn, then Premier Properties sent Plaintiff an email while she was in the hospital on suicide watch that they would be re-renting Plaintiff's apartment. Plaintiff begged them not to, but they refused to listen to Plaintiff.

9.     Plaintiff had worked with Vocational Rehabilitation for several years to have an Ebay business in her home to sell her dolls she no longer wanted and other items and this employment goal was now taken away as well (this was pre-covid where in-home jobs were scarce). Plaintiff wrote to the HRA and told them it was discriminatory to deny her reasonable accommodation request for a larger apartment related to her business as the business was to help her disability and had been fully supported with medical documentation and fully approved by Richfield HRA for a 2 bedroom voucher, so with Vocational Rehabilitation's help, they called HUD and HUD employees intervened and on May 25, 2016 Plaintiff ultimately got the apartment that Premier Properties attempted to re-rent to someone else, even though Plaintiff had a signed lease on it; however, not until Plaintiff was severely damaged by their actions and as a result had little time, motivation or energy to pack and move. Because of this, Plaintiff's belongings got packed and moved hurriedly and in an unorganized mess and things got moved into her apartment that should have been moved to storage and vice versa.

10. After Plaintiff moved to her apartment, Plaintiff's apartment was too full of boxes and unorganized mess for Plaintiff to handle it on her own and Plaintiff was depressed, scared, and left with deteriorating mental and physical health as a result of Bloomington HRA and Premier Properties, such as loss of motivation, excessive fears of unpacking and being forced to move again or go homeless, loss of interest in life and her new business, inability to unpack and organize her apartment, lack of interest in exercise, emotional overeating and weight gain, heart problems, worsening depression, nightmares, excessive worry and rumination about losing her housing, etc. Plaintiff had a severe nervous breakdown that Plaintiff has never recovered from as a direct result of Defendant HRA and Landlord's conduct and Plaintiff was and has been unable to unpack and organize much of anything in her apartment on her own and has also been scared to unpack for fear that she would be forced to move again. The trauma of having two apartments taken from her and almost going homeless after having stable housing for 20 years (Plaintiff was notified May 18, 2016 that her voucher would not be granted and that she would not get the apartment – she had to be out of her apartment by June 1, 2016 and now had nowhere to move to or to put her things) exacerbated a small manageable hoarding problem (collecting vintage dolls) into a major hoarding disability/illness, where it was difficult to move inside her apartment. Plaintiff has diagnosed PTSD resulting from Defendants' conduct and trauma is a major factor in exacerbating and causing hoarding difficulties and tendencies.

11. Plaintiff previously had her HCV voucher through Richfield HRA and had no problems with them in nearly 20 years and passed every yearly inspection without fail, with never being written up as needing a repair and took excellent care of her apartment. Plaintiff called in one repair to the HRA when her oven no longer worked. The Richfield HRA Administrator Lynnette Chambers described Plaintiff's apartment as outstanding. She writes in

part: ". . . the inspectors would always come back and tell me about your apartment and how lovely it was. They always commented that not only was it meticulously clean, but it looked like a quaint antique shop where you had artistic displays set up in every room. The inspectors don't normally comment on their inspections, but your unit was always a stand out in such a positive way they would comment on it". "I had the opportunity to visit your apartment and indeed it was meticulously clean, tidy and beautifully presented. In fact I think I commented at the time just as I did yesterday that one could eat off your floor".

12.     Before all of this discrimination, harassment and retaliation described herein, Plaintiff cared a lot more about the cleanliness, upkeep and look of her home, but after the suicide attempt in May 2016 that Bloomington HRA and this Landlord caused and the exacerbation of her PTSD and hoarding, Plaintiff has never recovered and has gotten more disabled to the point where Plaintiff has not been able to start her business that Plaintiff needed to help her disability, self-esteem and to earn some money and that would have helped Plaintiff dispose of some of her belongings by selling them.

### Premier Properties

13.     In April 2020, the federal government issued a lockdown due to a new pandemic of a deadly virus that was highly contagious and spreading very fast and killing thousands of people worldwide. The State of Minnesota issued similar lockdowns and had strict rules and executive orders severely limiting our activities over the course of many months and this lessened over time as more became known about the covid virus and after vaccination and treatment options had been developed. In the beginning, all efforts were being made to "slow the spread" and to just engage in necessary and essential activities, like grocery shopping and to just stay home as much as possible. Most retail stores, restaurants, gyms, schools, places of worship,

government services, and others were closed for many months. Over a million people in the United States died from covid. The covid virus was particularly dangerous and deadly for those people with high risk conditions, such as obesity and those over 65, which made Plaintiff a high risk person to be especially careful to stay away from possible risk of exposure to covid.

14.    In or about May, 2020 Plaintiff received notice from her Landlord Premier Properties that they would be entering every tenant's apartment to do a fuse box changeover (from fuses to breaker box), which would entail roughly 5-6 hours of essentially construction/demolition and electrical work and then cosmetic work to repair the damage over a period of 2 days. We were still under lockdown or under the Governor's Executive Orders to refrain from doing unnecessary work in your home and to limit contact to slow the spread. This was not essential work, nor did any fuse box need any repairs, it was work so that the Landlord could get a cheaper rate on his insurance. This did not comport with the Governor's Executive Orders. Plaintiff immediately notified her Landlord that she was requesting reasonable accommodation due to her disabilities and because she was a high risk person who should not be exposed to covid. She requested reasonable accommodation to not have the work done until fall and later, after the vaccine came out. Even though Plaintiff asked not to be bothered anymore about this and stated that it was exacerbating her disabilities, the Landlord repeatedly pressured and threatened Plaintiff. Andrew Akins pounded on Plaintiff's door and left a note in the spring of 2021, he emailed and threatened to enter Plaintiff's apartment when Plaintiff was in the hospital in October of 2020 on IV antibiotics for a pacemaker infection and related surgery, Plaintiff received a phone call from him when she was shopping for a thermometer at Walgreens and he threatened that she had better comply, and his managers at the complex Petra and Bob Larson pressured Plaintiff over the fuse box change out. Petra told Plaintiff that since Petra and

others had it done, then Plaintiff should be able to have it done, thereby minimizing her disabilities and shaming Plaintiff.

15.     In April, 2021 Plaintiff had the fuse box work done as the Landlord would not wait any longer and he was finishing the fuse box work at his other properties. At this time, Plaintiff was still extremely scared of covid. Plaintiff was extremely scared and panicked about covid, particularly so until the vaccine came out and this eventually got better but lasted until about December 2022.

16.     Andrew Akins and the onsite property managers, Bob and Petra Larson, were very unhappy that Plaintiff asked for and needed reasonable accommodation and Plaintiff received numerous emails and negative actions regarding this. Plaintiff was even bothered and scolded in a hospital bed when she was on IV antibiotics for a severe infection and on the eve of heart surgery and he knew Plaintiff was in the hospital and very ill.

17.     Plaintiff has asked for reasonable accommodation prior to this. Plaintiff asked for reasonable accommodation to have appointments and adequate notice for all repairs and the Landlord has said no. Plaintiff asked for reasonable accommodation for a garage when she signed her lease with Petra in about May 2016 and plaintiff asked yearly thereafter. Petra told her she would put her on a waiting list for a garage but that there were 3 people ahead of her and that it would take a long while as the people with garages tended to live at the complex a long time and retain their garages.    Plaintiff is aware that people that moved in long after Plaintiff have been given garages at this complex while Plaintiff was repeatedly passed over for one.

18.     On or about August 11, 2021 Plaintiff received a phone call from Petra Larson, onsite property manager, and she alleged that the apartment below Plaintiff's apartment reported they had flies. Petra said that they wanted a pest inspector to go into Plaintiff's apartment the

next day and inspect. Plaintiff told Petra that she didn't have flies and that due to her disabilities she would need more notice for (non-emergency) inspections and repairs, as this wasn't even a 24 hour notice, but Plaintiff did not refuse inspection to be conducted at some later time. Petra was not happy, but ended the call. Plaintiff did not hear any more from the Landlord until Plaintiff had a surprise visit from the City of Bloomington Environmental Health Department on August 26, 2021. There were three people standing and/or pounding on Plaintiff's door (see narrative below in Bloomington section) and they scared, surprised, shocked and terrified Plaintiff as Plaintiff was laying down due to illness.

19.     Unknown to Plaintiff, either Andrew Akins or Bob Larson called in a complaint to Bloomington Environmental Health about Plaintiff on August 19, 2021. The complaint states that Plaintiff is a hoarder and that her apartment is so bad that she has flies and smells so bad that the neighbors can smell it down the hall. While it true that Plaintiff has developed the disability of hoarding, along with her other disabilities, Plaintiff hoarding consists of having too many possessions in her apartment causing an inability to use the rooms in a normal manner. This has been very distressing to Plaintiff, but Plaintiff has never had any infestation of flies and does not ever have smells or accumulation of any garbage that would have smells. The Landlord filed a substantially false report about Plaintiff. The Landlord did not give Plaintiff any notice of any reporting to the City and did not accommodate Plaintiff's disabilities. The Landlord harassed Plaintiff for her disabilities and retaliated by filing a false report. The Landlord also did not tell Plaintiff of the City Inspection, so that it would be a surprise to Plaintiff. The Environmental Health Department told the Landlord to tell Plaintiff about the inspection.

20.     Plaintiff has always been a good, quiet tenant who paid her rent on time. Plaintiff's drawbacks to this Landlord is that she has disabilities that they do not want to provide reasonable accommodations for and for which Plaintiff has been harassed for.

21.     In July, 2022 Plaintiff notified Premier Properties by email that her electronic payment had bounced because Plaintiff had it set to pay the balance after the HRA paid their portion of her rent, ensuring that only her portion would be paid from her bank account. The HRA did not pay their portion (described more fully below in the HRA section of this complaint), so the full rent amount was automatically taken from Plaintiff's account. Plaintiff apologized and said that the HRA was refusing to pay their housing assistance payment (HAP), so Plaintiff was exploring other ways in which that part of the rent could be paid. Plaintiff's share of the rent was paid promptly after the bank unfroze the money in her account due to the overdraft.     After much research into the HUD Housing Choice Voucher program, Plaintiff determined that the rules provided that housing authorities must pay the housing assistance payment as long as the tenant is residing on the property.

22.     Bloomington HRA kept refusing to pay the HAP on behalf of Plaintiff, so this Landlord sent Plaintiff eviction notices in July, August, September and October 2022, even though Plaintiff did not owe them any money, as Plaintiff had paid her portion of the rent.  In July 2022, Plaintiff contacted Hennepin County to see if they could help Plaintiff pay the rent that Bloomington HRA owed to the Landlord, so that Plaintiff would not get evicted as Plaintiff was very scared she might get evicted.   In September, 2022 Andrew Akins sent an email to Plaintiff stating that he was starting eviction proceedings for nonpayment of rent the next day and this caused severe emotional distress and panic to Plaintiff who has PTSD, stemming from the loss of her housing twice, a suicide attempt and recurring fears and nightmares of going

21

homeless. Mr. Akins did this, knowing that he would be evicting Plaintiff for the housing assistance payment, that he knew that Plaintiff was not responsible for. Mr. Akins also knew that under the HUD Housing Choice Voucher rules, he was not allowed to threaten or coerce Plaintiff to pay any rent more than was calculated by the HRA as the tenant's portion of the rent. He also knew that the tenant was not responsible and could not be evicted for any rent that the Housing Authority owed which was Bloomington HRA. Knowing all of this, Mr. Akins still chose to harass, threaten, coerce and shake down Plaintiff for rent she did not owe. He had a contract with the HRA and was bound by HUD rules, but consciously chose to terrorize Plaintiff to pay him money that he knew she didn't owe him. He did this to a mentally and physically disabled senior citizen who is a vulnerable adult.

### City of Bloomington

23.    The City of Bloomington Environmental Health Division received a complaint on August 19, 2021 from either Bob Larson, on-site property manager or Andrew Akins, an owner/operator of the complex, that Plaintiff was a hoarder and had a fly infestation and strong odors emanating from her apartment so that her neighbors could smell it. This was substantially false, and although Plaintiff has too many personal items in her apartment and hoards/collects things, Plaintiff has never had smells or fly infestations. This falsified report prompted an inspection by the City of Bloomington. *Exhibit* ____

24.    On August 26, 2021 at approximately 1:00 pm, Plaintiff was terrorized and traumatized when Shannon Rohrer, Annmarie Williams, and Lisa Schroeder Olson from the City of Bloomington very loudly pounded on Plaintiff's door for about 15-30 minutes and repeatedly yelled City of Bloomington, as this visit to inspect Plaintiff's apartment was unannounced and no contact to Plaintiff from the City of Bloomington prior to this was even attempted. Plaintiff was

laying down at the time and was just quietly watching TV. Plaintiff was shell-shocked, shaking, very startled and terrified and Plaintiff already has PTSD. Plaintiff didn't know what to do as she does not have unannounced visitors and doesn't open the door to strangers. The complaint stated that Plaintiff had "some special needs", but no attempt was made beforehand to contact Plaintiff to find out how they could accommodate those special needs or to find out what they were. Shannon Rohrer later told Plaintiff that it was their policy not to contact the person who hoards about the inspection.

25. After they left, Plaintiff frantically and in tears called the City to find out why they came to her door and she was given information that a complaint due to hoarding, fly infestation and strong odors from her apartment had been filed against her. Plaintiff had several phone conversations with the department and Karla Henderson, the Director of Community Development. Plaintiff later called the inspections department and inquired generally about all other inspections and was told that people are allowed appointments for inspections and no inspections are unannounced.

26. The inspectors found no evidence of any odors or flies around Plaintiff's apartment and the complaint was dismissed/case closed on August 31, 2021. If there was any fly infestation at all, it likely came from a hole in the wall next to the back door where it appears there are insect eggs and rodent tunnels that the Landlord failed to maintain, not from Plaintiff's apartment.

27. The situation was forwarded by Karla Henderson, Director of Community Development, to the Bloomington HRA, as both departments are under her watch, to follow up on and no one from Bloomington HRA, including Bryan Hartmann, ever followed up with or

attempted to help Plaintiff in any manner on this hoarding matter from August 31, 2021 to when her inspection was held in June, 2022.

28.     Plaintiff was treated like a criminal instead of a person with mental and physical disabilities, including a hoarding disability, when they showed up at her door unannounced. They disrespected, made fun of and stereotyped Plaintiff and her hoarding disability by calling her apartment a "GUD", which is their euphemism for Gross Unsanitary Dwelling, before they had even seen Plaintiff's apartment or talked to Plaintiff. They did not allow for Plaintiff to have knowledge or input on any inspection time. They treated Plaintiff in a very dismissive, hostile and dehumanizing manner. They pounded incessantly on Plaintiff's door and yelled City of Bloomington for 15-30 minutes and numerous times so that all of her neighbors could hear and to intimidate Plaintiff to open the door like she was a criminal. They did not allow Plaintiff the ability to ask for any reasonable accommodations beforehand, when they showed up at Plaintiff's door unannounced. Plaintiff has had the reasonable accommodation of having, needing and requiring appointments for all visits to her home for the last 20 or so years, supported by medical documentation, because Plaintiff gets easily startled and very anxious when she has visitors due to her disabilities and needs to know who and when someone is coming to see her, so that she can be ready mentally and otherwise. Defendants humiliated Plaintiff in front of her neighbors by pounding on her door and yelling repeatedly City of Bloomington. Plaintiff now has nightmares about people forcing their way into her apartment, sometimes with a battering ram, and harming her as a result of this trauma.

29.     The City of Bloomington, by their discrimination of Plaintiff, has caused Plaintiff severe emotional distress and exacerbation of physical and mental symptoms, including PTSD, nightmares, shaking, crying, humiliation and embarrassment, loss of interest, loss of self-esteem,

severe depression and anxiety, exacerbation of leg pain and swelling due to inflammation from the stress, loss of sleep, among other things.

## Bloomington HRA

30.    Bloomington HRA has discriminated against Plaintiff pretty much continuously since May 2016 and since before Plaintiff moved into the property and was awarded a voucher through Bloomington HRA. This discrimination has been continuing and persistent throughout Plaintiff's tenancy in Bloomington. First, it started with a refusal to accommodate Plaintiff's disability by denying her the voucher she needed and then by denying her the apartment she had found before she even moved to Bloomington. It continued by charging her too much money for her tenant share of the rent by unlawfully counting Plaintiff's inheritance as income. Due to Plaintiff's mental disabilities, she has needed a representative payee since approximately 1996 to manage her Social Security Disability Income. In May 2016, when Plaintiff applied for her housing in Bloomington, she told both the Landlord and Bloomington HRA that she had a representative payee because of her disability. Bloomington HRA has forced Plaintiff to pay 30% of her inheritance as her tenant share of the rent in addition to 30% of her SSDI as they count it as income, although inheritances are not counted as income under HUD guidelines. Because Plaintiff's father put her inheritance into a trust so it could be managed by someone due her disability and so that Plaintiff couldn't squander it all at once, Plaintiff is inexplicably being charged by the HRA nearly 1/3 of her inheritance. Plaintiff has complained numerous times, in addition to every year at recertification time, and the HRA has told her that she would have to just cash it out to avoid the 30% charge, but that would defeat the purpose of the necessity of the trust. Plaintiff tried to do that because it was so unfair for her to lose 30% of her inheritance just because of her disability needs and it caused family problems. At one point, Plaintiff stopped

25

taking money out of the trust to avoid paying the excessive and unwarranted penalty. Solely because Plaintiff has a disability related need to get her inheritance in that manner, Bloomington HRA has punished Plaintiff by forcibly taking nearly one third of her inheritance that other non-disabled people who can get their inheritances in a lump sum are not required to pay. If Plaintiff got the same money inheritance in her checking account in a lump sum and paid herself $250/month from her inheritance, it would not be counted as income and instead be counted as an asset with no 30% penalty, even though it is the same amount of money with the only difference being the method of delivery, which Plaintiff needs for her disability. Plaintiff has complained to the HRA every year and has asked for her money back. On February 22, 2022 Plaintiff wrote an email to the HRA asking for reasonable accommodation to not count her inheritance/trust as income and instead an asset and Plaintiff asked for all of her money that she was unlawfully forced to pay be returned to her. Plaintiff stated that it was discriminatory to treat her differently in the terms of HCV voucher and to charge her more money than non-disabled people. On May 23, 2022 Defendants asked for verification of the inheritance which Plaintiff provided in June 2022. To date, Defendants have not reimbursed Plaintiff any money for the unlawful taking of her inheritance and starting on July 1, 2022 when Plaintiff's recertification was done, the HRA continued charging Plaintiff the 30% penalty, which equates to higher rent for her portion.

*31.* On May 17, 2022 Plaintiff's doctor wrote a letter requesting reasonable accommodation to postpone Plaintiff's upcoming June 2022 inspection until October, 31, 2022, so that Plaintiff would have adequate time to get help and be able to work slowly on cleaning up and organizing her apartment so that she would not exacerbate her mental and physical disabilities. Plaintiff's hoarding problem was that she had too many belongings in the apartment

on top of things never getting unpacked from her move in so that her rooms and walkways were not useful for the intended purpose, not that her apartment was filthy (gross) or a health or safety hazard for the other tenants. This request was reasonable since Bloomington HRA's own newsletter of December 2019 states *"Create reasonable and safe expectations. Prepare for a long road ahead to the end goal, which needs to be outlined in a written agreement and monitored."* In another part, it states: *"Initiate and accommodate. Hoarders don't usually ask for accommodation. While hoarders should ask for an accommodation, Fair Housing law trends suggest that if a Landlord knows or should have known about the disability, then there is a duty by the property to accommodate."* **Exhibit** ____

32. Bloomington HRA was specifically given instructions by the City of Bloomington Community Development Director Karla Henderson to help Plaintiff with her hoarding disability from August 31, 2021 until at least her HCV inspection and failed to contact Plaintiff at all during this time. **Exhibit** ____ Both Bloomington HRA and the City of Bloomington knew Plaintiff had a hoarding disability and needed help long before the spring 2022 scheduling of her inspection and they deliberately did not help or even contact Plaintiff. There should have been a plan put into place with reasonable expectations to help Plaintiff with her disability and living situation, but Bloomington HRA did nothing and instead allowed Plaintiff to suffer and then treated Plaintiff unreasonably and opposite of what they describe in their newsletter, by forcing an inspection when Plaintiff told them she needed more time due to her disabilities and by other unreasonable actions, such as unlawfully punishing Plaintiff by refusing to pay her HAP payments, among other things. Bloomington HRA wanted it cleaned up almost immediately and treated Plaintiff as if it was a small task and could be done in a couple of weeks and unreasonably forced an inspection on June 30, 2022, clearly in stark contradiction with their own

newsletter, which requires patience, working with an individual on a plan and understanding that it is a disability of which the Plaintiff was having difficulty with and needing accommodations.

33. Plaintiff's doctor asked for reasonable accommodation until October 31, 2022 so that Plaintiff would be able to clean up her apartment, have time to get some help and not overstress or overwork herself and exacerbate her disabilities even worse. This accommodation was necessary so that Plaintiff could obtain a safe and comfortable apartment and to be able to pass her inspection and keep her apartment in compliance with HUD rules. Plaintiff had wanted help to move some of the boxes out and to have an orderly apartment since she moved in, but was unable to do it herself, due to illegal actions described herein in this complaint by Defendants Bloomington HRA, City of Bloomington, Premier Properties and Andrew Akins that disabled Plaintiff even worse in her housing.

34. Bloomington HRA denied her reasonable accommodation request of the extension of time until October 31 and demanded the inspection be done by June 30, 2022 with the caveat that Plaintiff could ask for more time afterwards to correct deficiencies. Defendants never engaged in any written or oral plans to help Plaintiff or in any interactive process where they could have set reasonable goals and checked in with Plaintiff to see progress as their own newsletter states is necessary for someone with a hoarding disability; instead, they just forced an inspection and if Plaintiff would have refused the June 30 inspection, it would have been considered a substantial violation for which she would have lost her housing and Section 8 voucher. Plaintiff informed them that giving her until June 30, 2022 wasn't going to help her much and didn't amount to really any accommodation considering the circumstances, but they still forced the inspection. This was very distressing to Plaintiff, because Plaintiff knew she could not make enough progress in that amount of time and would fail the inspection, it was

humiliating to have someone come into her apartment with it looking so bad and unkempt, and she feared it would cause problems with her landlord, voucher and housing stability. Plaintiff wanted to postpone any inspection until after it was cleaned up. Bloomington HRA only wanted to see Plaintiff's apartment and to cause her problems and punish Plaintiff for her disabilities.

35. Plaintiff's apartment was inspected on June 30, 2022 and it did not pass. The inspector noted on the inspection report that the inspection was inconclusive, that there were many piles of personal belongings, but there was no garbage. It was also noted that there was not adequate walking space/pathways in the apartment due to the accumulation, but he did not see any infestations to note on the report. Immediately after the inspection, Plaintiff received notification from Bloomington HRA that no Housing Assistance Payment (HAP) subsidy would be paid on her behalf until her unit passed and starting July 1, 2022, Bloomington HRA intentionally refused to pay Plaintiff's Landlord their portion of the rent and used a false reason to do so, by relying on a Section of the Statute regarding Landlord's obligations that clearly only applies to the landlord, as there was a Tenant obligation section that purposefully omitted any abatement of rent.

36. Plaintiff was traumatized by the forced inspection as it was humiliating and degrading for Plaintiff, it exacerbated Plaintiff's physical problems and then she was very distressed by the unlawful nonpayment of the HAP rent. Plaintiff worried incessantly that she would be evicted and lose her housing and then her HCV voucher if the Landlord only received her portion of the rent. Due to the HRA's nonpayment of the HAP, Plaintiff was immediately hit with an overdraft of her bank account, as Plaintiff had set her rent on automatic payment after the HAP payment was paid each month; however, since no HAP payment was paid, the entire rent amount was taken out of Plaintiff's account. Plaintiff had no money to live on as she was now

more than $500 overdrawn and could not pay her insurance bill due on July 4, which contributed to her insurance being cancelled. The transaction was reversed in a few days, but it caused Plaintiff many problems, both emotional and financial. Plaintiff then immediately repaid her portion of the rent. Plaintiff was always in good standing with her rent at this complex and her previous apartment complex for more than 20 years.

37.     Defendant Bloomington HRA falsely told Plaintiff that they were legally required to withhold or abate the rent due to § 982.404(a)(3) Owner obligations, stating *"The PHA must not make any housing assistance payments for a dwelling unit that fails to meet the HQS, unless the owner corrects the defect within the period specified by the PHA . . .;* however, this clearly is under the Landlord Owner's obligations and only pertains to the Landlord's refusal to repair things or their violations of the Housing Quality Standards and only then can the Public Housing Authority (PHA) abate the rent to the landlord for his deficiencies. There is a separate section that pertains to the Family obligations under (b) which does not contain any provision that they are allowed to abate the rent for tenant deficiencies. Also, Chapter 10 of the HUD Guidebook states unequivocally *"Housing Assistance Payments are **never** abated for tenant deficiencies".* Bloomington HRA, both before and after Plaintiff pointed out to them the real facts stated here, negligently and intentionally continued to put forth false reasons on why they had to abate the rent and intentionally discriminated and retaliated when they refused to pay the rent and intentionally deprived Plaintiff of her voucher payment property under false pretenses for many months and purposely created the situation where Plaintiff would get evicted over the abated HAP and then lose her voucher, due to the eviction. ***Exhibits _____***

38.     Plaintiff also asked for reasonable accommodation for Bloomington HRA to pay the HAP payment along with her reasonable accommodation of extending the deadline for her

inspection, even though they were already legally required to do so under federal law and HUD rules. *Exhibit* ____ Bloomington HRA's refusal to pay the HAP that they were contractually obligated to pay on behalf of Plaintiff violated reasonable accommodation laws, was a reduction in services in violation of discrimination laws and was retaliatory, as Plaintiff had complained about ongoing discrimination from February 2022 through June 2022 when they abated the rent, when she asked for her inheritance money back that she was illegally charged and told them they were discriminating against her by not reasonably accommodating her disability and by treating her differently than non-disabled program participants. Plaintiff sent them copies of the Chapter 10 relevant language and the Statute they cited showing that they were quoting from the Landlord's obligations, not the tenant family's obligations and told them they were wrongly withholding the rent and requested numerous times that they pay the HAP, but they still refused after all of that. Plaintiff was getting very frustrated with Bloomington HRA because they were deliberately violating the law and Plaintiff was suffering for it and having to spend an inordinate amount of time, stress and energy making repeated requests, researching the law that they weren't following or send them documents that they were just ignoring or denying – they did this all for sport and because they could abuse a vulnerable adult if they wanted to, because who is going to do anything about it.

39.     On July 18, 2022 Plaintiff again requested her original reasonable accommodation for an extension until October 31, 2022 to get her apartment ready for re-inspection and to pay the HAP as part of the reasonable accommodation request. It was granted, but they still refused to pay the HAP and then Plaintiff's Landlord started sending Plaintiff eviction notices. Plaintiff received at least 3 eviction notices in July, August and September 2022 and a rent delinquency notice in October, 2022. Plaintiff was working with Hennepin County to see if she could get

emergency funding to help stave off eviction, even though she knew she didn't owe any of this rent and that it was Bloomington HRA's obligation to pay it, but Plaintiff was so fearful of eviction and homelessness due to her prior experiences with Bloomington and this Landlord and resulting PTSD. Plaintiff informed the Landlord this. On September 14 and September 19, 2022 Plaintiff's Landlord, Andrew Akins sent Plaintiff emails threatening eviction and stating that he was starting eviction proceedings.

40.    On September 25, 2022 Hennepin County paid the August through September HAP payments so that Plaintiff could avoid eviction proceedings from the Landlord and keep her housing.    At all times, Bloomington HRA was aware that Plaintiff was receiving eviction notices and harassment from her Landlord and was on the verge of being evicted due to their nonpayment of the HAP, because they received copies of the notices and Plaintiff sent them numerous emails begging them to pay the rent and telling them it was causing her great distress.

41.    In September 2022 Plaintiff had written to the Minneapolis HUD Director Michele Smith, and told her that Plaintiff was being evicted for the portion of the rent that the Housing Authority was obligated to pay.  On October 2, 2022 after some research, the HUD Director emailed Plaintiff and Bloomington HRA and agreed that it was Bloomington HRA's obligation to pay the HAP since July and ordered them to pay it.  Bloomington did not take any steps to pay the July, August or September back HAP payments until January, 2023, causing Plaintiff to receive more delinquent notices and additional stress, and instead they used Plaintiff's grant money for those months as their HAP payment, without Plaintiff's permission.

42.    Plaintiff tried very hard to work on and ready her apartment for inspection, but the stress of receiving constant eviction notices and Bloomington HRA's refusal to pay their HAP portion of the rent was too overwhelming for Plaintiff and Plaintiff was very stressed and

distressed and could not focus on her apartment or find any help that could do the work that was necessary. Plaintiff also did not have money to fund any help due to Bloomington HRA's confiscation of 30% of her inheritance which amounted to about $6000. These two defendants exacerbated all of her disabilities and made things far worse for Plaintiff.

43.     On October 21, 2022 Plaintiff wrote to Bloomington HRA requesting another extension of time until January 31, 2022 to fix her deficiencies from the inspection of June 30, 2022, which essentially was to keep working on making her apartment orderly enough to pass inspection and also so that she could focus on getting much needed medical attention due to their conduct. Plaintiff also asked to just wait until the next inspection in May 2023 as an option. Plaintiff was needing this time because the last 3 month extension totally consumed Plaintiff's energy, health and time with fending off eviction and trying to get Bloomington HRA to pay their portion of the rent, along with the severe stress that it caused that made Plaintiff's disabilities worse and ability to clean up and organize her apartment much worse. Plaintiff had been continually harassed, threatened with eviction, defamed and abused by her Landlord for rent that she never owed caused by the Housing Authority's harassment and retaliation of not paying the HAP, making Plaintiff too emotionally distraught, anxious, and exhausted from the stress, so that she was unable to get the work done necessary to pass her inspection and needed medical care. Plaintiff already had PTSD from Defendants Bloomington HRA and Premier Properties' conduct and this made her mental health much worse and worsened her mobility problems and leg, back, knee and hip pain. Plaintiff was having nightmares and unable to sleep and was terrified with constant worry and rumination of not passing her inspection and losing her apartment and of being evicted. Defendant Bloomington HRA knew that Plaintiff had PTSD regarding this and was particularly susceptible to emotional distress arising from her fears of

33

going homeless and having 2 apartments taken from her in a short span of time, one through involuntary displacement and one through discrimination. Yet, they intentionally and unlawfully refused to pay her rent knowing that she would get eviction notices from her Landlord and that this would make her even more stressed and disabled. Plaintiff was constantly threatened by Bloomington HRA with the loss of her housing voucher and this made Plaintiff even more terrified, anxious and unable to work on her hoarding problem within her apartment.

44.     Plaintiff's doctor wrote another letter in support of this accommodation telling the HRA that what they were doing was exacerbating Plaintiff's disabilities and making her more unable to work on her apartment. In general, the literature on hoarding overwhelmingly states not to pressure the person who hoards, but to work with them to set reasonable goals and to expect setbacks and be patient and expect it to be a long process. Plaintiff was treated by the City of Bloomington and Bloomington HRA as though she has a character flaw of being an unclean, messy garbage person, rather than as someone with a serious medical/mental health disability and was treated more like a criminal, when they showed up unannounced, pounded and demanded to be let in and when Plaintiff spoke to Shannon Rohrer and her supervisorr afterwards, she was threatened and disrespected.

45.     On October 24, 2022 this accommodation was denied by the Housing Authority. Plaintiff asked for the accommodation several times in different emails and stated that she could send pictures or a video of her progress thus far, but that she really needed to get medical attention as her doctor said she needed medical care and/or hospitalization. All attempts Plaintiff made at any further accommodation were denied and Plaintiff was told the inspection would take place on October 31, 2022.     Instead Ms. Coleman and Bloomington HRA repeatedly kept threatening Plaintiff's housing and voucher.

46.     The weekend before the inspection, Plaintiff was attempting to work on her apartment to ready it for inspection, but it was much too big of a task for Plaintiff and Plaintiff was far too ill, with mobility problems, leg pain and swelling, back pain and severe depression, suicidal ideation, exacerbation of PTSD and severe anxiety from her situation and the way Bloomington HRA and her Landlord had treated her for many months.  On Sunday night, October 30 Plaintiff was up during the middle of the night frantically attempting to clean her apartment and move things out of the way to make room for the inspection the next day that she knew she would fail and not get any time to correct deficiencies and Plaintiff piled some boxes too high and several heavy boxes came down on top of her and hit her in the head and neck and broke her glasses.  Plaintiff was dazed and then started throwing up and had a bad head and neck pain.  After a couple of hours, Plaintiff went to the ER as she was scared she may be badly injured and she was dizzy.

47.     While in the ER, they asked Plaintiff questions about her medical and mental health.  Plaintiff explained her situation as best as she could at the time and said that she was very depressed, anxious and feeling suicidal when questioned.  Plaintiff received some medical tests and the doctor told Plaintiff he believed she probably had a concussion. Plaintiff also received a mental health examination.  Plaintiff was placed on a legal hold and was hospitalized.

48.     Before 8 a.m. on October 31, 2022 Plaintiff emailed both Robin Anderson, the person handling the recertification and inspection that day and Aarica Coleman, the Administrator of the HCV Program and Bloomington HRA several times.  Plaintiff told them she was hospitalized, had been placed on a legal hold so that she could not leave the hospital and that the inspection that day would need to be cancelled and rescheduled for another later date after she was home.  Plaintiff also sent them pictures of her in the hospital and a picture of the legal

hold, in the event they didn't believe her and so that she would be left alone while she was recovering in the hospital. *Exhibit* ____

49. Plaintiff received an email from Aarica Coleman at 11:41 a.m. on October 31, 2022 *Exhibit* ____ stating that they had been to Plaintiff's apartment for the inspection at 11:00 a.m. and that they gave Plaintiff a fail for the inspection and demanding that Plaintiff allow the inspection for the next day. There were two attachments to the email, one was the failed inspection report *Exhibit* ____ and the other was a letter from Aarica Coleman *Exhibit* ____ stating that if the HRA is not able to inspect Plaintiff's unit on November 1, 2022, they would be terminating Plaintiff's participation in the program due to non-cooperation. Also attached to the letter was a picture of the documents posted on Plaintiff's door showing them in an unsealed envelope. *Exhibit* ____.

50. This caused Plaintiff enormous distress at a time when she was suicidal, depressed, severely anxious and had a head injury and was a vulnerable adult and in an extremely vulnerable state of mind. Defendants knew that Plaintiff was severely ill, hospitalized and a vulnerable adult at the time they sent her a letter threatening her and posting private information about her on her door in a public hallway and sending her a picture of the posted items. Plaintiff emailed back and asked them to remove the postings on her door, because Plaintiff was unable to do it and would not be home for many days, but Aarica refused to send anyone from Bloomington HRA to do that and the posting remained on Plaintiff's door for the entire time Plaintiff remained hospitalized. Bloomington HRA knew that Plaintiff was hospitalized for 3 weeks and the day on which Plaintiff would be discharged and did not send anyone to remove the postings from Plaintiff's door for the entire time. Plaintiff's home is only about 2 miles and 5 minutes away from where they office at City Hall and they had already made

36

time to go to Plaintiff's home twice that day at 11:00 for inspection and 11:41 to post things on her door, so it would have been easy for them to remove the items. When they went to Plaintiff's door twice that day, both times they knew Plaintiff was not home and that she was in the hospital and would not have the inspection, so there was no justification to post anything on Plaintiff's door or even to go there that day, because they knew where Plaintiff was and Plaintiff was communicating by email with them. Plaintiff was very distressed during her entire hospital stay that her private information was posted in the public hallway of her apartment building where everyone could see or take the materials, including her neighbors, Landlord and anyone coming into the building. Plaintiff even asked if she could go home on a pass and remove it because she was so worried, and asked someone at Hennepin County if they could go take it down, but they refused. On October 10, 2022 Plaintiff sent an email to Robin Anderson, Aarica Coleman, etc. expressing her concern that she would be scared to see an eviction notice or other bad news posted on her door and complaining about the discrimination Plaintiff had been subjected to from Ms. Coleman including that she illegally refused to pay Plaintiff's HAP rent, and copied HUD, City of Bloomington attorney, etc. and only 2 weeks later, Ms. Coleman posts threatening and private information on her door. On October 5, 2022 Michele Smith, Minneapolis area HUD Director, sent Ms. Coleman an email ordering her to pay Plaintiff's HAP rent and that Ms. Coleman failed to reasonably accommodate Plaintiff in not paying her HAP. ***Exhibit*** _____ All throughout October, Plaintiff copied the HUD Director on the emails Plaintiff sent Ms. Coleman, so Ms. Coleman knew that Plaintiff had complained and gone to HUD for help due to Ms. Coleman's discrimination and retaliation of Plaintiff and so Ms. Coleman decided to get back at Plaintiff and posted private information on Plaintiff's door and taunted Plaintiff in the hospital about it by sending her pictures of it.

51.     While Plaintiff was hospitalized at MHealth Riverside for three weeks, Ms. Coleman required Plaintiff to provide constant proof that she was there. Ms. Coleman was obsessed with harassing and threatening Plaintiff and with wanting any excuse to terminate Plaintiff's HCV voucher, rather than working with Plaintiff to come up with a reasonable plan and helping her achieve it so that she could retain her housing.     Plaintiff's doctor at MHealth Riverside wrote a letter to Ms. Coleman and Bloomington HRA asking for reasonable accommodation to have her inspection no sooner than 30 days after her date of discharge. Plaintiff wanted more and needed more than the 30 days, but Plaintiff was under great pressure to come up with a date that Ms. Coleman might approve. When Ms. Coleman did not respond, Plaintiff's doctor called her and Ms. Coleman allowed Plaintiff the minimum requested and the inspection was set up for December 21, 2022. Plaintiff was assigned a case manager in the hospital and one through Hennepin County. Plaintiff only wanted help moving some of the heavy boxes out of her apartment after she went through them so that she could go through her paperwork and things on her own; however, there wasn't time and especially since Plaintiff was sick for half of the 30 days. Due to the shortage of time and circumstances, Plaintiff was forced to have strangers come into her apartment and they went through her private and personal belongings. Plaintiff was forced to throw away many childhood mementos and all of her family pictures as there wasn't time to go through her belongings. Plaintiff was forced to donate things she recently bought and things she wanted to keep as there wasn't time to go through things and sort them out.     Many things that Plaintiff treasured got thrown away, taken or donated. Plaintiff is devastated. Things that Plaintiff bought for her Ebay store got donated and at least $5000 worth of items got permanently removed that Plaintiff either didn't authorize or would not have parted with if Plaintiff had been given more time to sort through and been given a garage

earlier. Plaintiff was not given a garage until January 1, only 10 days after the inspection. Had Plaintiff been given the garage before the inspection, Plaintiff could have stored in the garage all of those items until summer, when she could have properly gone through them. Plaintiff also wanted to have a garage sale on the items she didn't want to earn some extra money to fix her car, but those items are now gone due to the inspection. No one should be forced to give up the things they love and all of their family pictures and mementos just to live in subsidized housing or because they are being discriminated against and retaliated against.

52.     Plaintiff got very sick with norovirus for about two weeks after she was discharged, so the cleanup could not start until December 14, 2022. Plaintiff is very anxious having people, particularly strangers, in her apartment and this was way too hard on Plaintiff, particularly since many of her prized and very cherished things are now gone as a direct result of forcing an inspection too early and under threat of losing her housing. Plaintiff asked for a waiver of the inspection until the following year as a reasonable accommodation or until January 31, 2022. If that had happened, Plaintiff would still have her family pictures and cherished possessions. If Plaintiff would have been given a garage earlier instead of more than 6 years after repeatedly asking for one, Plaintiff could have stored a lot of her things there earlier and certainly would not have lost them forever in December 2022 as they could have been taken there instead of to the thrift store or the dumpster. Plaintiff's close family are no longer living and the pictures were all Plaintiff had and now they're gone and Plaintiff is devastated. This did not need to happen.

53.     Plaintiff had the inspection on December 21, 2022, and they only stated that Robin Anderson, the inspector, would be coming. However, Aarica Coleman also showed up and Plaintiff was never told ahead of time about this. This caused a lot of distress for Plaintiff

and Ms. Coleman did not have an appointment and she showed up unannounced. Since Ms. Coleman had discriminated and retaliated against Plaintiff, she was not welcome in Plaintiff's home. A couple of days after the inspection, Plaintiff came down with RSV and was very sick for more than two weeks. Plaintiff had not been anywhere, so she had to have gotten it related to the inspection in some way. There was no need for Ms. Coleman to be there – Plaintiff had gone through 25 prior HCV inspections and no supervisor ever accompanied an inspector.

54. Plaintiff has been so stressed, distressed, anxious, panicked, distraught and depressed, among other things, over unlawful actions that the Bloomington HRA, City of Bloomington and her Landlord took against Plaintiff, that since October 2020 until October 2023, Plaintiff's heart function has significantly decreased and Plaintiff needed to get a cardiac monitor implanted last week and other heart tests. Plaintiff's health, heart and otherwise, has significantly gone downhill due to the stress. Plaintiff has gained weight due to lack of exercise and comfort eating from the stress. Plaintiff's lack of exercise has mainly been due to increased inflammation in her legs with pain and stiffness and swelling from the stress and depression. Plaintiff's condition of her apartment got worse due to the stress, Plaintiff has not been able to start her home Ebay business due to the stress and living conditions, Plaintiff has now lost many of her cherished possessions due to the above name Defendants. Plaintiff just needed to be left alone by these Defendants and given an adequate amount of time and an improvement plan for her hoarding that best suited her needs and disabilities, without constant interference, threats, harassment, retaliation, pressure and hostility that she was subjected to on a continuous basis.

## United States Housing & Urban Development

55. HUD's online complaint form is antiquated, has not been updated in years and does not meet the needs of people with disabilities. Among the problem areas is that the system

times out in 45 minutes and for people with disabilities in particular, it takes longer to compose, think, edit and type the complaint than 45 minutes. It causes stress and pressure to get it done fast before the time is up and it is erased and Plaintiff was not finished with her HUD complaints when she was required and pressured to send them before the 45 minutes were up. In addition, there is too small of a maximum character limit and Plaintiff was only partway through her complaint when she had reached the maximum limit and the system would no longer allow her to type. Then Plaintiff had to guess how many sentences, words and paragraphs to delete in order to be able to type anymore or finish answering the questions, all hurrying to get it done before the 45 minute time out. This is unworkable for people with disabilities. In addition, it is the only method of filing that gives you a receipt – an email of a copy of your complaint saying it is received. HUD must update this computer program and eliminate the time limit of 45 minutes and character limit, or at least increase them by double. This has a bigger deleterious effect on disabled people as in comparison to other non-disabled groups, due to lack of finger mobility, memory challenges, mental health disabilities, neurological disabilities, developmental disabilities, and generally people with severe illnesses, among other things.

      56. Plaintiff filed 6 discrimination complaints on April 22, 2022 and August 25, 2022 (3 on each date for each defendant) regarding the above Defendants. Plaintiff, as stated above in the introduction, was not done and had great difficulty with the online computer HUD complaint system, but had to get them sent before the 45 minutes was up or they would be erased and she would have to start all over. Plaintiff patiently waited to hear from HUD. Plaintiff received one phone call from a 202 area code but there was no message left. Plaintiff did not know who called. In or about June or July, 2022 Plaintiff received a letter from HUD saying they had dismissed her complaints because either Plaintiff did not call them back or they could not reach

Plaintiff. Plaintiff was expecting a letter from HUD asking for more information, but instead she got a dismissal. Plaintiff then refiled the complaints online on August 25, 2022 and Plaintiff never heard from HUD at all. In late October, 2022 Michele Smith from HUD asked Plaintiff to forward Plaintiff's copy of the complaints to her and she called HUD Fair Housing Division for Plaintiff. She told Plaintiff that HUD dismissed the second complaint because it was poorly worded. Plaintiff told Michele that the computer was about to time out so Plaintiff had to write them in a hurried fashion and due to the character limit, had to remove much of what she wanted to put in the complaints. Michele also told Plaintiff that HUD told Michelle that they were swamped with discrimination complaints as a result of a backlog from the covid pandemic and people working from home. Plaintiff's complaints were given no due diligence from HUD and were basically thrown into the garbage because HUD wanted to clear their backlog. Plaintiff's complaints languished at HUD for approximately 4 months for nothing, time that should be added to Plaintiff's statute of limitations.

57.     HUD needs to amend their guidebook or handbook/rules to make it mandatory that when disabled people, particularly those with mental and physical disabilities, receive their inheritance in a trust that the trust be treated as though it were a lump sum asset rather than income when money is taken from it for the disabled person's use. Some people with disabilities must receive their inheritances in a trust with someone to manage their money, like Plaintiff's situation described above, and they should never be penalized for needing a representative to manage the money in their trust, when non-disabled people who receive their inheritances in a lump sum who are able to manage their own money, do not get penalized 30% of their inheritance. Housing Authorities must be told in the rules, that they are not allowed to charge or penalize a disabled person, when that person needs the money/inheritance doled out to them in

this manner and delivery because of their disability. This is discrimination on its face and Housing Authority's like Bloomington HRA are taking advantage of and discriminating against disabled people because of not being told that they can't. This is especially true and can happen when the Housing Authority has a grudge against that disabled person, like Plaintiff, or when they simply don't care to fairly evaluate this situation. Inheritances are not treated as income, but trusts are and the rules do not differentiate or explain this kind of scenario. It is especially important to make this a mandatory rule, so that disabled people, like Plaintiff, are not taken advantage of by Housing Authorities and because the people who have these kinds of trusts for these reasons, are especially vulnerable and usually poor and cannot afford to give up 30% of their inheritance. Plaintiff's father thought he was protecting Plaintiff and making sure Plaintiff did not mismanage the money, by having another person handle it and dole only so much out at a time. Plaintiff's father would be devastated if he knew that his method of delivery of her inheritance that he left her caused her to lose 30% of her inheritance. If Plaintiff had received her inheritance as a lump sum instead of in a trust, Plaintiff would not have lost 30% or had to pay 30% more in her portion of the rent because of it. If Plaintiff had been able to get a lump sum and deposited it into her checking account and paid herself $250/month from it, it would not have been counted as income or penalized 30%. But because Plaintiff got sent $250/month from her money manager from the identical amount of money in her trust, Plaintiff must forfeit 30% of it. In both cases, it is the identical amount of money and the identical monthly payments. The $250 is the same whether it comes directly from Plaintiff's account or from the account that is managing it for her, it is the same amount of money and the same amount of inheritance.

58.     Bloomington HRA knows that Plaintiff has had a representative payee for about 25 years for managing her SSDI. Plaintiff simply had another person managing her inheritance

due to her disability and was put in a bank account with her name on it which she did not have access to. Plaintiff was unable to get her inheritance in a lump sum due to her disability and Plaintiff should not be penalized for the method of delivery that she got her inheritance when it was needed for her disability.

59. HUD must write mandatory rules that Housing Authorities can't count inheritances as income when put into trusts in this kind of instance, as it is discriminatory by increasing the amount of tenant share of the rent due to disability, a failure to reasonable accommodate by refusing to adjust the rules so that Plaintiff can get receive her money in this manner without penalty and it is disparate treatment when non-disabled people who can get their inheritance in a lump sum don't pay a 30% penalty to HUD on that money, from HUD charging a 30% higher tenant share of the rent by counting the inheritance as income. It also causes a discriminatory effect as developmentally disabled people and people with mental disabilities disproportionately need trusts and money managers at a much higher rate than non-disabled people and should never be penalized when needing those services as a result of a disability.

60. HUD must make a rule change or change their guidance concerning porting vouchers and reasonable accommodations. It is too burdensome for HUD to require a disabled person to get both the sending Housing Authority and the Receiving Housing Authority both to approve a reasonable accommodation, particularly at moving and porting time. This causes enormous problems when one Housing Authority approves the accommodation for a 2 bedroom apartment and the family, as in Plaintiff's case, finds an apartment for the voucher and then the receiving Housing Authority to where the family is porting to denies the reasonable accommodation for the number of bedrooms. The disabled person should only be required to get either the old or the new Housing Authorities approval, not both, as it can cause enormous stress,

problems, and homelessness when the new Housing Authority decides they are going to refuse the reasonable accommodation that the other Housing authority just approved. Moving is stressful anyway for the heartiest of people, and disruption and this kind of chaos to a disabled person's life like this can result in marked deterioration of health and no home.

61.     The Minneapolis HUD office has denied Plaintiff's FOIA request for her records that she submitted to them on October 6, 2022 as not being specific enough. Plaintiff requested all records pertaining to herself concerning her interactions and participation with Bloomington HRA and HUD employees and all records regarding Bloomington HRA's interactions with HUD concerning Plaintiff. There may have been some more specificity needed on some of the records, but HUD could have provided Plaintiff with some records. HUD instead chose not to provide Plaintiff with any records. *Exhibit ____*

62.     HUD should be ordered to produce at least some of the records to Plaintiff.

## LEGAL CLAIMS

## DISABILITY DISCRIMINATION UNDER THE FHA, FHAA and the MHRA, AMERICANS WITH DISABILITIES ACT and 504 OF THE REHABILITATION ACT

63.     The federal Fair Housing Act (FHA) and Fair Housing Amendments Act (FHAA) prohibits discrimination in housing practices on the basis of protected class status, including race, disability, familial status, and national origin. 42 U.S.C. § 3604, parts of § 3601-3619, including failure to reasonably accommodate. The Minnesota Human Rights Act (MHRA) prohibits discrimination in substantially the same manner. As do the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act prohibits entities receiving government funding from discriminatory practices. In the course of engaging in a series of actions designed to discriminate against Plaintiff on the basis of her disability, Defendants have treated Plaintiff

45

differently and less favorably in the following ways. Defendants have also failed to reasonably accommodate Plaintiff in the following ways.

## City of Bloomington

64.    The allegations in this complaint regarding City of Bloomington are hereby re-alleged and incorporated by reference.

65.    The City of Bloomington Environmental Health Department discriminated against Plaintiff by treating Plaintiff differently and less favorably in the manner of services provided to her on account of her mental and hoarding disabilities. The City of Bloomington Inspections Department of Environmental Health did not contact Plaintiff directly in any manner to inform her of an inspection and did not allow Plaintiff any input on or allow her to schedule the initial visit for inspection. Defendant City of Bloomington had a policy in place not to contact the person who hoards, which is a discriminatory policy on its face as it treats those with a hoarding disability differently and much less favorably than non-disabled persons and those without hoarding disabilities. In contrast, for all other kinds of inspections, for people without hoarding disabilities, they contact or directly communicate with non-disabled people and allow them notice and input on scheduling of inspections. They do not just show up unannounced for inspections. Plaintiff was subjected to intimidation and harassment and treated less favorably when Shannon Rohrer, AnnMarie Williams and Lisa Schroeder Olson excessively banged and pounded on Plaintiff's door and repeatedly yelled "City of Bloomington" for 15-30 minutes. Plaintiff was treated very disrespectfully and as though she was a criminal at times during the entire process, instead of someone with a disability.

66.    The City of Bloomington also stereotyped and made fun of Plaintiff as an unclean, gross hoarder, before they had even seen her apartment or spoken to Plaintiff, even

46

though there are different levels of hoarding. They wrote in the complaint that she was a possible "GUD", which is their euphemism for Gross Unsanitary Dwelling. This prompted the City to not give any respect or consideration to Plaintiff and contributed to them showing up unannounced and so aggressively, because they felt that Plaintiff and her disability were gross, undesirable and not deserving of respect or any dignity. Plaintiff was treated very badly and as though she was a bad person because of her disabilities and in stark contrast to what the City of Bloomington/HRA had published in their own newsletter regarding hoarding.

67. The City of Bloomington also failed to reasonably accommodate Plaintiff's hoarding and mental health disabilities by not allowing Plaintiff to ask for reasonable accommodations ahead of their unannounced visit, as Plaintiff was surprised, shocked and unaware that they were coming. If Plaintiff had been contacted prior to their visit, Plaintiff would have asked for reasonable accommodations not to come without an appointment or unannounced and told them they could not do this as it exacerbates her disabilities. Plaintiff has had reasonable accommodations since approximately 1996 that Landlords cannot come to her door unannounced and without an appointment, because it causes Plaintiff severe anxiety, among other things, due to her mental health conditions and startles Plaintiff and Plaintiff has a heart rhythm condition, which required a pacemaker, until it was removed due to infection.

68. The City of Bloomington by their illegal discrimination of Plaintiff caused Plaintiff severe emotional distress and other damages. Plaintiff suffered and continues to suffer nightmares of someone knocking down her door or forcing their way in, being too scared some days to leave her apartment, severe anxiety, fright, panic, crying spells, chest pain, severe distress/stress that exacerbates her leg, knee, hip and back pain, leg swelling, among other things.

47

## Bloomington HRA

69.     The allegations in this complaint regarding Bloomington HRA are hereby re-alleged and incorporated by reference.

70.     Bloomington HRA discriminated against Plaintiff in many ways and numerous times by refusing to grant extensions of time for the 2022 Housing Choice Voucher inspection that Plaintiff needed as a reasonable accommodation for her disabilities, starting in May, 2022 through December, 2022. They granted some extensions, but most of those extensions were to their liking, were not what Plaintiff requested or needed or agreed to, and much of the time did not help Plaintiff. They did not engage in any interactive process with Plaintiff or even try to come up with a plan where Plaintiff could work on cleaning up her apartment on a gradual basis with monitoring to see improvements, not all done at once, like they demanded. Plaintiff suggested and asked for all kinds of things to help her in remedying the problem from Bloomington HRA and Bloomington flatly denied all of them, without reciprocation of any kind to work on any kind of solution. For the most part, they violated their own guidelines that Bloomington HRA was sponsoring/teaching on hoarding to others from their hoarding newsletter. They treated Plaintiff much differently and less favorably and were far more impatient, intolerant, intimidating and threatening than what they were teaching to Landlords regarding how to treat tenants that hoard. They also interfered with the extensions they granted by intentionally causing Plaintiff so much stress by not paying her HAP, that it made Plaintiff unable to do the work necessary in her apartment to correct deficiencies and clean up/organize her apartment to pass inspection.

71.     The Bloomington HRA refused to pay Plaintiff's rental subsidy for many months from July 2022 through October 2022, even when Plaintiff provided to the HRA

irrefutable proof that under state and federal law and HUD rules, that they owed it and were obligated to pay it, according to Chapter 10 of the HUD guidebook wherein it states that the HAP can never be abated for tenant deficiencies. Bloomington HRA provided a false reason to Plaintiff for why they refused to pay it by using the Landlord's obligations part of the statute that only pertained to the Landlord for their deficiencies in the inspection/repair process. The HRA continued with this false narrative and pretense until HUD ordered them to pay all of the HAP that they have refused. Bloomington HRA would never have paid Plaintiff's HAP payment, if HUD had not ordered them to and if Plaintiff had not contacted HUD for their help. The HRA illegally denied/reduced Plaintiff's services of the rental subsidy on account of Plaintiff needing reasonable accommodation of an inspection extension of time for her hoarding disability. On October 6, 2022 Minneapolis Field Office HUD Director Michele Smith ordered Bloomington HRA to pay the subsidy and said that it should have been paid as part of the reasonable accommodation that Plaintiff requested for an extension of time to cleanup for the HCV inspection. There is no doubt that Bloomington HRA intentionally discriminated and retaliated against Plaintiff by not paying the HAP portion of her rent to the Landlord and reducing her services and also failed to reasonably accommodate by not paying it.

72.     Bloomington HRA also immediately started the abatement/refusal to pay the HAP subsidy portion of Plaintiff's rent on July 1, 2022 after the June 30, 2022 inspection, which also violated the HUD rules, as both the Landlord and the family are to be given 30 days to correct deficiencies, but they immediately retaliated and abated the HAP rent, because Bloomington wanted to cause as much harm as possible and have the Landlord evict Plaintiff so that Plaintiff would then lose her HCV voucher as a result..

73.     Bloomington HRA also discriminated when they overcharged Plaintiff for her portion of the rent by unlawfully charging her 30% of her inheritance and treated Plaintiff differently and less favorably than non-disabled families within the Housing Choice Voucher Program. Plaintiff was forced to pay approximately 30% more in rent since 2016 than her non-disabled counterparts in the program who received inheritances in a lump sum. Plaintiff was unable to receive her inheritance in a lump sum due to her disability as she has difficulty managing money and has had a rep payee for her SSDI for about 25 years as a result. Bloomington overcharged Plaintiff by approximately $6,000 and this was very distressing and Plaintiff desperately needed that money to live on and pay for needed items, like car repairs, to hire help with her hoarding problem, and a recliner for her painful, swollen legs. Plaintiff's car has been inoperable for about a year and Plaintiff has not had transportation and been housebound most of the time. Bloomington has refused to refund the money and repeatedly kept charging Plaintiff. Bloomington forced Plaintiff to pay the extra money and Plaintiff would have lost her housing and her voucher had she refused.

74.     Plaintiff asked as a reasonable accommodation on October 31, 2022 for Ms. Coleman to take the things off her door that they unlawfully posted (a letter threatening termination of the program and a failed inspection report that they posted in an unsealed envelope) because it was very distressing to Plaintiff and she was in the hospital on a legal hold and unable to do it herself, as she was not allowed to leave. Plaintiff was suicidal and severely depressed and was a vulnerable adult/senior. Ms. Coleman refused and the items were posted on her door for all three weeks she was hospitalized and for all of her neighbors, Landlord and visitors to the building to see and read. Bloomington failed to reasonably accommodate Plaintiff.

75.     Bloomington HRA treated Plaintiff less favorably and retaliated when they posted private information on her door on October 31, 2022 after they knew she was in the hospital and not home and harassed, abused and threatened Plaintiff while she was in a hospital by sending her a photo of it and continually threatening Plaintiff with the loss of her home and voucher. The HRA intentionally violated privacy laws to discriminate and retaliate against Plaintiff because Plaintiff opposed their illegal discriminatory and retaliatory actions and asked for reasonable accommodations in writing to the HRA on a continual basis especially since February 2022 and up to October 31, 2022 and the HRA was aware that she had complained to HUD as HUD on October 6, 2022 had ordered Ms. Coleman to reinstate and pay all missed HAP payments and stated that Ms. Coleman had discriminated/refused to reasonably accommodate Plaintiff. Furthermore, Plaintiff copied Michele Smith on the accommodations she requested in late October 2022 to extend the inspection to January 31, 2023 or preferably to extend it until her next yearly inspection in May 2023.

76.     Bloomington HRA by their illegal discrimination of Plaintiff caused Plaintiff severe emotional distress and other damages. Plaintiff suffered and continues to suffer nightmares, being too scared some days to leave her apartment, loss of self-esteem, humiliation, exacerbated PTSD, severe depression and anxiety, exacerbated fears of losing her home and going homeless, fright, panic, crying spells, chest pain, severe distress/stress that exacerbates her leg, knee, hip and back pain, leg swelling, weight gain, heart palpitations, head and neck pain, among other things. Plaintiff was so despondent and distressed that she needed to be hospitalized for three weeks due to Bloomington HRA's illegal conduct towards her.

## Premier Properties

77.     The allegations in this complaint regarding Premier Properties are hereby re-alleged and incorporated by reference.

78.     Defendant Premier Properties discriminated by refusing to reasonably accommodate Plaintiff in the following ways:  by refusing reasonable accommodations with reference to scheduling repairs and not coming to Plaintiff's door unannounced, by refusing another storage locker as a reasonable accommodation for Plaintiff's hoarding disability so that she could cleanup, by refusing or waiting too long to reasonably accommodate Plaintiff with a garage that Plaintiff needed for both her physical and hoarding disabilities, by treating Plaintiff differently and less favorably than non-disabled tenants because they received garages much quicker than Plaintiff as Plaintiff waited for 6 years, while many new move-ins received a garage either immediately or much sooner.  Plaintiff was apparently placed on a perpetual waiting list and never moved up from 3rd place for a garage, from July 2016 through January 1, 2023, when she finally got one.  By this time it was too late, Plaintiff's car is no longer operable and Plaintiff lost most of her things two weeks earlier in the forced cleanup of her apartment that Plaintiff needed a longer amount of time for.  Plaintiff would have used the garage to store most of those items to gradually go through in the spring and summer, instead of being forced to get rid of them due to forced time constraints, because Bloomington HRA refused to wait any longer for inspection.

79.     Defendant also failed to reasonably accommodate Plaintiff during covid, when he wanted to do a fuse box change out for his own benefit to save money on his insurance rates. Plaintiff was harassed repeatedly for at least 9 months, after she asked for reasonable accommodation.

80. Premier Properties also failed to reasonably accommodate Plaintiff's hoarding disability when they called in a complaint about Plaintiff's hoarding to the City of Bloomington instead of working with Plaintiff to address the problem.

81. As a result of Defendants actions, Plaintiff has suffered and continues to suffer severe emotional distress, severe depression, crying spells, weight gain, heart palpitations and pain from the stress, exacerbation of her leg pain and swelling, humiliation, fear, panic, shock and disbelief, loss of self-esteem, loss of interest and loss of ambition, among other things. Plaintiff also was so despondent and depressed that she needed to be hospitalized for three weeks as a result of Defendants actions.

## RETALIATION AND OTHER PROHIBITED CONDUCT UNDER the FHA and MHRA

82. The federal Fair Housing Act prohibits retaliation against any person because that person has made a complaint, testified, assisted or participated in any manner in a proceeding under the Fair Housing Act. 42 U.S.C. § 3617, 24 C.F.R. § 100.400. Similarly, it is unlawful to threaten, interfere, coerce, and intimidate against any protected class person in their assertions of rights to be treated equally with other tenants at the property and in connection with the rental and enjoyment of their housing rights and dwelling.

83. Defendants were aware that Plaintiff was opposing their discriminatory housing actions through a series of emails that Plaintiff wrote to the Defendants close in time to these events.

### Premier Properties

84. The allegations in this complaint regarding Premier Properties are hereby re-alleged and incorporated by reference.

85.    Defendant Premier Properties retaliated against Plaintiff when they intentionally filed a substantially false report/complaint against Plaintiff with the City of Bloomington Environmental Health Division on August 19, 2021 for hoarding, fly infestation and severe odors emanating from her apartment and down the hallway and again when they didn't tell Plaintiff about the August 25, 2021 inspection and intentionally created the situation where Plaintiff would get a surprise, unannounced inspection. Bob Larson and Andrew Akins were angry about the delay Plaintiff caused them on the fuse box change outs because due to covid, Plaintiff needed reasonable accommodations for her disabilities and because she was a high risk person for covid. Plaintiff complained to Mr. Akins that Bob and Petra Larson were harassing her about an appointment for the fuse box change out and he told them to stop contacting her. However, they did not. Upon information and belief, it was Bob Larson or Andrew Akins that called in the false complaint to the City. They also retaliated when they did not give Plaintiff any time to correct any hoarding issues before calling the City. They also retaliated when they did not tell Plaintiff about the inspection, so that she would fail and then they would have grounds to evict her for poor housekeeping. However, the City of Bloomington dismissed the complaint on August 31, 2021. They did not try to work with Plaintiff about this before they filed the complaint, like Bloomington HRA's newsletter directs them to.

86.    Plaintiff told Mr. Akins that she had filed a HUD charge against Premier Properties in or around February and August 2022. Plaintiff was retaliated against when Andrew Akins charged Plaintiff for the HAP payment, without legal justification, when he knew that Plaintiff did not owe it and it was Bloomington HRA's responsibility to pay it. Mr. Akins threatened Plaintiff with eviction unless she paid it and started the eviction process by hiring a lawyer to evict Plaintiff for money she did not owe him. Mr. Akins sent Plaintiff a series of

eviction notices over a period of 4 months from July-October 2022 and sent at least two eviction threats to Plaintiff. Mr. Akins was going to take Plaintiff's home away from her unless she paid him money she did not legally owe him.

87.     Plaintiff also did not receive a garage that she requested in 2016 when she moved in and asked about every year, even though new move-ins got garages on many occasions during this time.     Plaintiff did not receive one until January, 2023, when it was too late to help her disabilities and as a result caused her severe damage. Petra and Bob Larson knew that Plaintiff had a hoarding problem and did not want Plaintiff living here as a result, so they would not allow her to get a garage to help with that.

88.     As a result of Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress, crying spells, weight gain, heart palpitations and damage from the stress, humiliation, fear, panic and nausea, among other things.

### Bloomington HRA

89.     The allegations in this complaint regarding Bloomington HRA are hereby re-alleged and incorporated by reference.

90.     Defendant Bloomington HRA retaliated against Plaintiff in numerous ways.

91.     Bloomington HRA and Ms. Coleman retaliated against Plaintiff when she posted private information about Plaintiff on Plaintiff's door on October 31, 2022 only two weeks after she learned that Plaintiff had contacted HUD regarding her discrimination of Plaintiff and after HUD ordered Ms. Coleman and Bloomington HRA to pay the HAP that they were illegally refusing to pay for Plaintiff's rental subsidy. She further retaliated when she sent Plaintiff a picture of the posted items when she knew Plaintiff was in a hospital bed on a mental health hold and had a head injury, because she knew this would upset Plaintiff because Plaintiff had sent her

an email on October 10, 2022 that Plaintiff was scared on finding something posted on her door. She further retaliated when she refused to take the postings down after Plaintiff asked her to and allowed them to remain there for three weeks for other people to see that Plaintiff had failed an inspection and that she was on the verge of being terminated from the program.

92. Bloomington HRA and Ms. Coleman retaliated when they refused to reimburse Plaintiff the 30% of her inheritance that she took. Plaintiff was asking for reasonable accommodation during this time and also had complained of discrimination by Bloomington HRA against her, when she made her request for reimbursement in the spring of 2022. There is no legal justification for keeping Plaintiff's inheritance, other than retaliation. They retaliated by again charging the 30% penalty in July 2022 and this has been ongoing and continuous. They have been retaliating since 2016 and charging Plaintiff the 30% because they knew that Plaintiff complained to HUD regarding their discrimination of denying Plaintiff the 2 bedroom voucher and then denying her the apartment. HUD intervened and only then did Plaintiff get the apartment. They have always been charging Plaintiff or attempting to charge Plaintiff more in rent than she should be charged to get back at Plaintiff.

93. Bloomington HRA retaliated against Plaintiff for her needing reasonable accommodations for her hoarding disability, by intentionally refusing to work with Plaintiff and come up with a workable plan that would see improvements made over a long period of time, rather than forcing Plaintiff to get everything done at once, like they did. They teach and offer classes in how to work with hoarders to clean up their homes and put out a newsletter regarding that, but they refuse to do that which they teach others to do. By intimidating, intolerance, and threatening letters to Plaintiff, they retaliated by continuously threatening Plaintiff, way more than was necessary. Ms. Coleman retaliated by just refusing almost all reasonable

accommodations and finding ways to work with Plaintiff disability, just for sport and out of spite.

94. Bloomington HRA retaliated in other ways listed in this complaint.

95. As a result of Defendants actions, Plaintiff suffered and continues to suffer severe emotional distress, crying spells, weight gain, heart palpitations and damages from the stress, humiliation, fear, panic and nausea, among other things.

## HOSTILE ENVIRONMENT HARASSMENT

### Bloomington HRA

96. The allegations in this complaint regarding Bloomington HRA are hereby re-alleged and incorporated by reference.

97. Bloomington HRA has pretty much continuously harassed Plaintiff throughout her entire tenancy when they have threatened and punished Plaintiff for her disabilities, including hoarding. The more they threatened and punished Plaintiff, the more disabled she became from the stress and the more unable to complete the tasks necessary to clean up and organize her apartment.

98. Bloomington HRA has made Plaintiff's tenancy much worse and stressful when they charged her 30% more of her inheritance for more than 6 years than her non-disabled counterparts in the program who were able to get their inheritances in a lump sum. This caused Plaintiff family problems because Plaintiff then tried to get the inheritance in a lump sum to avoid the 30% penalty. They charged Plaintiff for having a disability and for being unable to get her inheritance in a lump sum because she needed a money manager. Plaintiff complained every year and Bloomington HRA was aware that she needed a representative payee due to her

disabilities. Bloomington HRA has punished Plaintiff for her disability and refuses to refund her money that they illegally took from Plaintiff.

99.　Bloomington HRA refused to follow the HCV statute and HUD guidelines and illegally refused to pay Plaintiff's HAP payments from June-October 2022 as punishment for Plaintiff's hoarding disability. Bloomington felt that Plaintiff should be able to get her place cleaned-up by June 30, 2022, the day of the forced inspection by Bloomington HRA, even though Plaintiff and her doctor told them she needed until October 31, 2022. When Plaintiff did not pass her inspection as was expected, Bloomington refused to pay Plaintiff's HAP to the Landlord immediately starting July 1, 2022 as punishment. They refused to even allow Plaintiff the 30 day window to correct deficiencies before starting abatement of rent. HUD Chapter 10 guidelines state that "there can never be abatement of rent to the Landlord for tenant deficiencies". After Plaintiff showed them the guidelines, they still refused to pay the rent until January, 2023, some 3 months after HUD ordered them to. Every day they ignored Plaintiff's pleas to pay the rent, they harassed Plaintiff and they knowingly and intentionally allowed the Landlord to threaten Plaintiff with eviction over 4 months and they did nothing to stop it.

100.　Bloomington HRA and Ms. Coleman repeatedly sent Plaintiff many letters threatening Plaintiff with the termination of her voucher over several months in the fall of 2022 when Plaintiff was trying to work on getting her apartment ready for inspection. While Plaintiff was in the hospital on October 31, 2022 on a legal hold and could not leave and was suicidal due to Bloomington HRA's and the Landlord's treatment of her, Ms. Coleman knew this and still sent Plaintiff a letter by email threatening an inspection without Plaintiff being present the next day or she would face termination of her voucher, even though Plaintiff had asked for reasonable accommodation in May, 2022 that she needed to be present for all entries into her home and no

unannounced visits. Ms. Coleman went to or directed another Bloomington employee to Plaintiff's apartment knowing that Plaintiff's was in the hospital and she posted a failed inspection report, the above referenced letter and a picture of these things posted on her door and emailed this to Plaintiff, who she knew was in the hospital on a legal hold and could not leave, and which made Plaintiff a vulnerable adult. Plaintiff requested as a reasonable accommodation for her to remove the items since Plaintiff could not due to her disabilities and circumstances, but Ms. Coleman refused, even though she and/or her employees had the time to go to Plaintiff's door twice that day for a cancelled inspection and to illegally post Plaintiff's private data on her door in the public hallway of her apartment building for all of her neighbors and visitors to see.

101. There was continuing, pervasive and severe harassment of Plaintiff by Bloomington HRA and Ms. Coleman for no legitimate, lawful purpose and it was excessive. Plaintiff was harassed repeatedly for her disabilities, including hoarding, because she needed reasonable accommodations and because she complained to Bloomington about discrimination of her by employees and because she complained to HUD regarding discrimination against her.

**Premier Properties**

102. The allegations in this complaint regarding Premier Properties are hereby re-alleged and incorporated by reference.

103. Premier Properties harassed Plaintiff when they continually contacted, intimidated, threatened and pressured Plaintiff to allow a non-essential unnecessary fuse box change out in her apartment, so that the Landlord could save money on his insurance. Plaintiff was a high risk person for a bad outcome from covid and Plaintiff was terrified of it. Plaintiff asked for reasonable accommodation to delay the work and to stop harassing her about this. Mr. Akins and Bob and Petra Larson repeatedly harassed Plaintiff about this work, even after she told

them not to, including but not limited to,, at a Walgreens Store, while Plaintiff was in the hospital for a severe pacemaker infection and removal for a week and by pounding on her door. This occurred from June 2020 through April 2021.

104.    On August 19, 2021 Andrew Akins or most likely Bob Larson filed a substantially false report/complaint to the City of Bloomington on Plaintiff for hoarding, fly infestation and strong odors emanating from her apartment into the hallway. They were instructed to tell Plaintiff about an August 25, 2021 inspection by Bloomington Environmental Health of Plaintiff's apartment, but they intentionally did not inform Plaintiff so that she would get a surprise inspection. This traumatized Plaintiff and exacerbated Plaintiff's mental health and physical health conditions greatly. They did not try to work with Plaintiff on this before filing the complaint.

105.    Mr. Akins repeatedly and without legal justification threatened Plaintiff with eviction for nonpayment of rent, even though Plaintiff was current on her rent and had never missed a payment. He repeatedly threatened eviction for Plaintiff over the course of 4 months on about 8 occasions that Plaintiff must pay the HAP portion of the rent or she would face eviction. Plaintiff did not owe this rent, the Housing Authority did, and Mr. Akins knew that he was threatening Plaintiff with eviction for rent she did not owe.

106.    There was continuing, pervasive and severe harassment of Plaintiff by Premier Properties and Mr. Akins for no legitimate, lawful purpose and it was excessive. Plaintiff was harassed repeatedly for her disabilities, including hoarding, because she needed reasonable accommodations and because she complained to Premier Properties about discrimination of her by employees and because she complained to HUD regarding discrimination against her.

107.     Plaintiff has suffered and continues to suffer severe emotional distress, crying spells, extreme fears and nightmares of losing her home and going homeless, humiliation, severe depression and anxiety and exacerbations, PTSD, weight gain from the stress, heart palpitations from the stress, worsening leg pain and swelling from inflammation from the stress, among other things.

**CONVERSION**

108.     Under MN law, conversion is the act of willful interference with the property of another, done without lawful justification by which any person entitled thereto is deprived of use and possession.

**Bloomington HRA**

109.     The allegations in this complaint regarding Bloomington HRA are hereby re-alleged and incorporated by reference.

110.     Bloomington HRA committed conversion against Plaintiff when they deprived Plaintiff of her property in at least three different ways. Conversion is the deprivation of someone's property, the Defendant's conversion by a wrongful act or in a manner that is inconsistent with the plaintiff's property rights, and resulting damages.

111.     When Bloomington HRA refused to pay Plaintiff's HAP payment for four months from July 2022-October 2022, they committed conversion of Plaintiff's property of the HCV voucher/payment, because Plaintiff had property rights in that voucher and the resulting HAP payments and Bloomington intended for Plaintiff to lose those payments permanently until she passed her inspection, when they would resume, if they did not terminate her voucher first. Bloomington only resumed payment because Plaintiff complained to HUD and HUD ordered the HAP payments to resume, along with the back payments. As a result of Bloomington HRA's

61

illegal actions, Plaintiff suffered severe emotional distress and was continually harassed with eviction notices and threats from her Landlord. Plaintiff also suffered financial damages and lost her car insurance as a result when she could not pay her insurance as her funds were frozen when she suffered a severe overdraft of more than $500 as a direct result of the July 2022 nonpayment of the HAP by Bloomington HRA and this left Plaintiff with no money to live on over the July 4 holiday and severe panic.

112.    When Bloomington HRA refused to pay the HAP payment not until January 1, 2023 after HUD ordered them on October 6, 2022 to pay all of the payments due, Bloomington HRA committed conversion of Plaintiff's emergency assistance grant money that she was forced to apply for to pay the HAP payments that Bloomington HRA refused    From approximately October 6, 2022 through January 1, 2023 Bloomington HRA treated the grant money as their HAP payment, even though they were not entitled to do that, especially after HUD told them they were discriminating and ordered them to pay the HAP payments.    Bloomington intentionally intended to use the grant money as their HAP payment on a permanent basis and Plaintiff told them numerous times after October 6, 2022 that they could not.    Bloomington HRA never applied for the grant, was not eligible for the grant money and had no right to use the grant money as though it was their HAP payment. Plaintiff was deprived of her property interest in the grant money, because of Bloomington's illegal use of it as their HAP payment and subsequent plan to return the money to Hennepin County, as if it were their grant money. Bloomington HRA and the Landlord blocked Plaintiff from any access to that money when they immediately withdrew the funds from her account on the day Bloomington HRA finally paid the HAP. Plaintiff was the only one who had property rights in the grant money as Plaintiff applied for the grant and Hennepin County sent Plaintiff paperwork showing that she was the rightful

owner of the grant money, as Plaintiff would not be eligible for any more grants in 2022 and that Plaintiff must report the grant money as income on her taxes. Furthermore, Plaintiff had to give permission for the grant money to be sent to her Landlord. It was Plaintiff's grant, not the Bloomington HRA or Landlord's grant, and Plaintiff should have been the decision maker on the final disposition of the grant, because grants generally are not paid back. Plaintiff wanted and tried to get an opinion from the State or County on what to do with the grant. Plaintiff followed all of the rules of the program and the grant was thoroughly vetted for months before distribution. Neither Bloomington HRA nor the Landlord had any rights or say in the grant, particularly since they both committed heinous acts and fraud to instigate the issuing of the grant in the first place. Plaintiff never would have applied for the grant unless she had been threatened, coerced, intimidated and harassed with eviction and denied her property rights of her HAP payments.

113. Plaintiff has suffered emotional distress damages and humiliation when Bloomington HRA and her Landlord denied her access to her grant money. It was very distressing for Plaintiff to watch her Landlord and Bloomington HRA take control of the grant money as though it was theirs after all of their misconduct caused it to be issued in the first place and when Plaintiff had put so much effort and time into applying for it and the stress and humiliation that Plaintiff was put through in order to get approved for it. Plaintiff has suffered monetary damages and punitive damages if the grant money is shown to be Plaintiff's.

## Premier Properties

114. The allegations in this complaint regarding Premier Properties are hereby re-alleged and incorporated by reference.

115.    When Premier Properties, in conjunction with Bloomington HRA, removed Plaintiff's grant money from her account after Plaintiff told them not to and to leave it there or put it in an escrow account until she could work with Hennepin County to decide what to do with it, Premier Properties deprived Plaintiff of her property, that Hennepin County told her was her property when they issued her a statement of the grant money to declare as income on her taxes and when she was barred from any more grant money in 2022 (grant monies are only allowed once/year). Plaintiff never committed fraud in its issuance, Plaintiff was experiencing a severe emergency (loss of her home) and she followed all of the rules of the program. Plaintiff worked enormously hard to apply for that grant money with numerous phone calls and emails to Hennepin County and was required to have a home visit of her apartment from a County Social Worker to see the circumstances, which was very stressful and humiliating. Plaintiff worked very hard and sent numerous emails to get Bloomington HRA to pay the HAP that they were obligated to pay and she also wrote to HUD for their help with that, so that she could avoid getting the grant issued in the first place. Once it was issued, it became Plaintiff's property that she then authorized to be paid to Premier Properties and Premier Properties deprived Plaintiff permanently from access to her grant money and all decisions about it when they took the money from her account and gave it back to Hennepin County. It was not Premier Properties' right to make any decisions on that grant money, once the HAP was paid and there was a credit on her account for the amount of the grant. At that point, it was no longer Premier Properties money from the HAP payments, it reverted back to Plaintiff. Plaintiff was the only and proper person to handle the disposition of the grant money, especially since Bloomington HRA and the Landlord's illegal conduct caused it to be issued in the first place.

116.    Premier Properties converted Plaintiff's grant when they sent it back to Hennepin County and deducted it from her rental account. Plaintiff did not authorize Premier Properties to do that and they did it over Plaintiff's objections as though it was their grant money. Plaintiff was still wondering and working on what should be done with her grant money, including sending it back to Hennepin County as a possibility, but Plaintiff wanted to first get an opinion from the State and/or County.

117.    As a result, Premier Properties caused Plaintiff emotional distress, monetary damages, great humiliation and disrespect, stress and loss of self-worth, among other things.

## DEFAMATION

118.    The allegations in this complaint regarding Andrew Akins and/or Bob Larson are hereby re-alleged and incorporated by reference.

119.    On or around September 26, 2022 during a three way conversation between Andrew Akins, Cynthia Fahland of Hennepin County Emergency Assistance and Plaintiff, Mr. Akins told Ms. Fahland "she (referring to Plaintiff) said she was going to pay this and then she didn't and she also bounced her rent check in July." At the time Mr. Akins said this, he was mad that the grant money for Plaintiff's back rent had not been paid yet and he complained that he had to wait so long and he was speaking to Ms. Fahland and was portraying Plaintiff as a dead beat renter that didn't pay rent in July and now also owed several more months. Mr. Akins knew at the time that it was for HAP rent, but he did not tell Ms. Fahland that and instead complained about Plaintiff not paying rent in the phone call. Plaintiff did not bounce her rent check in July, and Plaintiff had more than enough money in her account for July's payment. When Bloomington HRA intentionally failed to make their HAP payment in July, the entire rent amount, instead of just Plaintiff's portion, was automatically paid from her bank account that

Plaintiff had registered with the rental app that Premier Properties wanted tenants to use and Plaintiff didn't have enough money in her account to cover the HAP payment in addition to her portion, so the payment was overdrafted and reversed. Plaintiff immediately paid her portion again after her account was put back in the positive and sent several apologies. He intentionally told Ms. Fahland information that was not correct and was more false than true and his intention was to portray a falsehood and portray Plaintiff in a bad light, or otherwise he would not have said it at all.

120. On September 26, 2022 Andrew Akins sent an email to his attorney Andrew Schwartz and Cynthia Fahland, the Hennepin County worker who approved Plaintiff's Emergency Assistance grant money to pay the HAP payment, calling off the eviction proceedings so that Plaintiff would not be evicted. Andrew Akins defamed Plaintiff when he stated in the email "They are going to pay the $2,226.00 that Claire Lee owes in back rent. Please stop all eviction proceedings . . ." The part of the statement that is false is "the $2,226.00 that Claire Lee owes in back rent". Plaintiff at the time did not owe anything in back rent, and certainly not $2,226.00 and had never owed any money in back rent since residing at this complex. Mr. Akins was fully aware that Plaintiff did not owe this money and that it was the HAP portion of the rent that Bloomington HRA owed. He was trying to make Hennepin County believe that Plaintiff was a problem tenant and a dead beat renter that didn't pay her rent, as this was the second time he intentionally portrayed Plaintiff in a poor light and with bad character as someone who didn't pay rent for months at a time, which was false.

121. On August 19, 2021 either Bob Larson or Andrew Akins called in a substantially false complaint to the Environmental Health/Inspections department at the City of Bloomington (the name is redacted from the report so Plaintiff can't see it, but there is enough identifying

information that shows it to be one of these two people). They complaint alleges that Plaintiff is a hoarder, which is true. The complaint also alleges that Plaintiff's apartment is infested with flies, which was false and that there is a strong odor emanating from the apartment so bad that her neighbors can smell it, which was false. Plaintiff cannot quote the exact words, because she did not hear the complaint and it has been redacted and there is no voice recording of the complaint.

122.   This put Plaintiff in a very bad light and ruined her reputation with at least some of the employees, since it caused the staff to refer to Plaintiff and her apartment as a "GUD", which stands for gross unsanitary dwelling. It is not nice to refer to someone as gross, particularly when they have never seen their apartment and just accept the word of a third party.

123.   Plaintiff suffered emotional distress, humiliation, loss of self-esteem, loss of good character, loss of interest and extreme sadness that others would think of her and her apartment as gross and someone who doesn't pay her rent and a deadbeat renter.

### ABUSE OF A VULNERABLE ADULT UNDER MN LAW and ELDER ABUSE

124.   Under MN Stat. 626.5572, Subd 21 a vulnerable adult is defined as one of the following: 1) a resident of a facility, such as a hospital, 2) receives services from a provider required to be licensed by the State of Minnesota, 3) receives services from a home care provider that offers, provides or arranges personal care assistance, or 4) has a physical or mental disability that impairs a person's ability to adequately care for themselves without assistance and as a result has an impaired ability to protect themselves from maltreatment.

125.   The allegations in this complaint regarding Bloomington HRA and Aarica Coleman are hereby re-alleged and incorporated by reference.

126.     During the time of Plaintiff's maltreatment from Bloomington HRA, Plaintiff met at least one or more of the criteria and thus was considered a vulnerable adult under MN law.

127.     From June through December 2022, Bloomington HRA threatened Plaintiff with the loss of her HCV housing voucher about a dozen times, when Plaintiff was trying her best to resolve her housing situation with hoarding and had been trying to get help and had been unsuccessful. Bloomington HRA knew that Plaintiff suffered from PTSD from past experiences related to her loss of housing, by Plaintiff telling them in emails and medical documentation, and severe fears of homeless (caused by Bloomington HRA) and the more Bloomington HRA threatened Plaintiff, the more disabled Plaintiff got, as they were threatening Plaintiff with the one thing Plaintiff feared the most, loss of her housing. They tortured and taunted Plaintiff with this far more than was reasonable or necessary. This was very abusive and unnecessary and caused Plaintiff extreme emotional distress and extreme fear of losing her housing and voucher and going homeless.

128.     From July through October 2022, Bloomington HRA intentionally failed and refused to pay Plaintiff's HAP rent payment, intentionally setting her up for eviction from her landlord and then mandatory loss of her housing voucher. Bloomington HRA knew that it was impermissible under federal law, HUD statutes and rules and under reasonable accommodation laws because Plaintiff sent them the statute and HUD rule, but they did it anyway and only stopped their illegal conduct after HUD ordered them to. Bloomington HRA still failed to pay the back HAP rental payments until January, 2023. Bloomington HRA intentionally worked to make Plaintiff's housing situation worse, instead of helping Plaintiff. Bloomington HRA was intentionally trying to cause problems with Plaintiff's housing and causing her to be evicted by

continuing to refuse to pay her rent, even after being ordered to. This caused Plaintiff great distress.

129.    On October, 31 Bloomington HRA and Aarica Coleman threatened Plaintiff with the loss of her housing and her voucher, while they knew that Plaintiff was in the hospital on a legal hold for mental health reasons and that Plaintiff was a vulnerable adult. They knew she had a prior suicide attempt from their previous illegal conduct of denying Plaintiff housing in May, 2016 and they knew that Plaintiff had resulting PTSD from this and severe fears of going homeless. Ms. Coleman taunted Plaintiff by email while she was in a hospital bed on a mental health hold while she also had a head injury and sent her emails threatening her housing, demanding an inspection the next day or Plaintiff would lose her voucher and housing and by sending her pictures of private information she had posted on Plaintiff's door, a failed inspection and threats of termination. She did this to get back at Plaintiff and to traumatize Plaintiff further and to terrorize Plaintiff and intentionally cause her emotional distress. This was severe abuse of a vulnerable adult, who was on a suicide watch on a mental health hold in the hospital. Plaintiff needed to be hospitalized for three weeks and worried about these things the entire time.

130.    Bloomington HRA and Ms. Coleman abused Plaintiff, a vulnerable adult, at a time when Plaintiff was most vulnerable and threatened and taunted Plaintiff with the loss of her home and voucher while Plaintiff was in the hospital. This caused Plaintiff extreme emotional distress, crying spells, panic, fear, severe depression and anxiety and physical exacerbations of her legs and heart palpitations, among other things.

## **VIOLATION OF MN CONVENANTS OF QUIET ENJOYMENT**

131.    The allegations in this complaint regarding Premier Properties are hereby re-allege and incorporated by reference.

132. Premier Properties harassed Plaintiff when they continually contacted, intimidated, threatened and pressured Plaintiff to allow a non-essential unnecessary fuse box change out in her apartment, so that the Landlord could save money on his insurance. Plaintiff was a high risk person for a bad outcome from covid and Plaintiff was terrified of it. Plaintiff asked for reasonable accommodation to delay the work and to stop harassing her about this. Mr. Akins and Bob and Petra Larson repeatedly harassed Plaintiff about this work, even after she told them not to, including but not limited to, at a Walgreens Store, while Plaintiff was in the hospital for a severe pacemaker infection and removal for a week, and by pounding on her door. This occurred from June 2020 through April 2021. On August 19, 2021 Andrew Akins or most likely Bob Larson filed a substantially false report/complaint to the City of Bloomington on Plaintiff for hoarding, fly infestation and strong odors emanating from her apartment into the hallway. They were instructed to tell Plaintiff about an August 25, 2021 inspection by Bloomington Environmental Health of Plaintiff's apartment, but they intentionally did not inform Plaintiff so that she would get a surprise inspection. This traumatized Plaintiff and exacerbated Plaintiff's mental health and physical health conditions greatly.

133. Mr. Akins repeatedly and without legal justification threatened Plaintiff with eviction for nonpayment of rent, even though Plaintiff was current on her rent and had never missed a payment. He repeatedly threatened eviction for Plaintiff over the course of 4 months on about 8 occasions that Plaintiff must pay the HAP portion of the rent or she would face eviction. Plaintiff did not owe this rent, the Housing Authority did, and Mr. Akins knew that he was threatening Plaintiff with eviction for rent she did not owe.

134. There was continuing, pervasive and severe harassment of Plaintiff by Premier Properties and Mr. Akins for no legitimate, lawful purpose and it was excessive. Plaintiff was

harassed repeatedly for her disabilities, including hoarding, because she needed reasonable accommodations and because she complained to Premier Properties about discrimination of her by employees and because she complained to HUD regarding discrimination against her.

135. Defendant caused other disruptions to Plaintiff's quiet enjoyment of her housing as stated previously in this complaint.

136. As a result of Defendants' actions, Plaintiff has suffered monetary damages and severe emotional distress, among other things.

## **PRIVACY VIOLATIONS and VIOLATION OF THE MGDPA, CHAPTER 13**

137. The allegations in this complaint regarding Bloomington HRA are hereby re-alleged and incorporated by reference.

138. Bloomington HRA has invaded Plaintiff's privacy rights and confidentiality by posting private HRA/housing subsidy information on Plaintiff's door on October 31, 2022 and leaving it in plain sight and open for all of Plaintiff's neighbors and anyone else walking by to see and read for three weeks and they refused to remove the documents from her door.

139. In publishing and disseminating Plaintiff's private housing subsidy and other private information in order to hurt, insult, belittle, harass, discriminate and retaliate against Plaintiff, Defendants have invaded Plaintiff's privacy rights. There was no legitimate, non-discriminatory non-retaliatory justification for this severe breach of Plaintiff's data privacy. Furthermore, Defendant Bloomington HRA published this information to other people without Plaintiff's permission or authorization and Plaintiff begged them to take it down because she was in the hospital and would not be home for a long while.

140. This has greatly exacerbated Plaintiff's physical and mental health symptoms. This has caused Plaintiff heart pain and palpitations, this has caused severe paranoia, anger,

severe emotional distress, crying spells, weight gain, heart palpitations from the stress, humiliation, fear, panic, among other things.

## NEGLIGENCE

### Defendant City of Bloomington

141. The allegations in this complaint regarding City of Bloomington are hereby re-alleged and incorporated by reference.

142. City of Bloomington willfully, negligently, maliciously, recklessly, wantonly and knowingly refused to contact Plaintiff about an inspection following a complaint of hoarding with a high degree of probability that it would result in a surprise, unannounced inspection visit and intrusion into Plaintiff's privacy and would result in making Plaintiff terrified, traumatized and lose the security and safety of her own home.

143. Defendant City of Bloomington's Environmental Health Division acted negligently, recklessly, intentionally, willfully, maliciously and wantonly when they showed up at Plaintiff's door without any attempt to personally notify her of an inspection. They knew that Plaintiff had "special needs" and may need reasonable accommodations for the visit. Had they taken even minimal steps to do so, Plaintiff could have been spared the severe emotional trauma and humiliation that ensued due to their actions.

144. Defendant City of Bloomington had the duty to notify Plaintiff directly of an inspection of her home, because Plaintiff was the person complained about and because that was Plaintiff's home, among other things. They also had the duty to notify her because they knew that she had "special needs" and would likely need reasonable accommodations.

145. In not contacting Plaintiff and showing up unannounced and pounding on Plaintiff's door and yelling City of Bloomington for 15-30 minutes, they caused Plaintiff to

suffer severe emotional distress, fright, severe humiliation, panic, crying, nightmares, fears of homelessness, fears of someone forcefully entering her home or breaking down her door, severe depression and anxiety, fears of leaving her home, among other things.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### City of Bloomington

146.    The allegations in this complaint regarding City of Bloomington are hereby re-alleged and incorporated by reference.

147.    Defendant City of Bloomington and its Environmental Health Division acted in an extreme and outrageous manner and in an intentional and reckless manner and their actions would have been utterly intolerable to most people in society.  Their actions caused Plaintiff severe emotional distress.

148.    The City of Bloomington knew or should have known that Plaintiff had PTSD and that coming to her door in that manner would have been utterly intolerable to her.  The City of Bloomington knew or should have known that Plaintiff was an extremely vulnerable person and that she would have been particularly susceptible to extreme emotional distress from showing up at her apartment unannounced, pounding on her door demanding to be let it and yelling City of Bloomington for 15-30 minutes.  Defendant City of Bloomington knew that Plaintiff had special needs and didn't even bother to find out what they were before they traumatized and terrorized Plaintiff.

149.    Defendant City of Bloomington caused severe panic, extreme emotional distress, shock and disbelief, severe humiliation, months of fear to leave apartment, heart arrhythmias and pain, exacerbations of physical pain and swelling to legs, nightmares and shaking, among other things, to Plaintiff, a vulnerable adult/senior with mental and physical disabilities.  Defendant's

negligence and inhumane treatment of Plaintiff by showing up at Plaintiff's door without prior notice of any kind and pounding on her door and yelling City of Bloomington for 15-30 minutes was meant to intentionally scare and intimidate Plaintiff to open the door and humiliate her in front of her neighbors. Defendant intentionally discriminated against Plaintiff and intentionally belittled, insulted and humiliated Plaintiff because of her disabilities.

150.    The above items each alone and taken in conjunction with one another, caused Plaintiff severe emotional distress. Each and every act by Defendant listed above and listed in this Complaint was extreme, outrageous, intentional and/or reckless.

151.    As a result of Defendants' actions, Plaintiff has suffered crying spells, she has gained a lot of weight due to severe depression and severe stress resulting from Defendants' actions, she has been hospitalized for three weeks, she has had heart palpitations/arrythmias and pain from the severe depression and stress, she has had severe panic attacks to where she couldn't speak and had stroke-like symptoms, she has had worsening of her back and leg pain and swelling due to the stress, she has had shaking and nightmares, she has had severe anger, loss of self-esteem, among many other things. Defendant's actions exacerbated and caused a hoarding disability and worsened Plaintiff's ability to care for herself and her apartment. Plaintiff has had to increase her normal medication dosage and double her doctor visits as a direct result of Defendants' actions.

**Bloomington HRA**

152.    The allegations in this complaint regarding Bloomington HRA are hereby re-alleged and incorporated by reference.

153.    Defendant Bloomington HRA acted in an extreme and outrageous manner and in an intentional and reckless manner and their actions would have been utterly intolerable to most

people in society. Their actions caused Plaintiff severe emotional distress. The HRA knew that Plaintiff was a very vulnerable adult/senior, had a representative payee for her SSDI and had mental and physical disabilities.

154. Bloomington HRA knew that Plaintiff had PTSD, in particular with fears of losing her housing and going homeless, yet they caused that scenario for Plaintiff deliberately by illegally refusing to pay her housing subsidy. They kept this up even after Plaintiff provided them with statutes, rules and laws showing the HRA that it was undeniably illegal not to pay her subsidy. Bloomington refused to pay Plaintiff's rent even when they knew that Plaintiff was receiving eviction notices and would be evicted. Bloomington did this intentionally so that Plaintiff would be evicted and lose her housing subsidy. Bloomington HRA also refused additional reasonable accommodations for extensions of time for Plaintiff's inspection so that Plaintiff could receive necessary medical treatment. Aarica Coleman and Robin Anderson intentionally went to Plaintiff's apartment after Plaintiff emailed that she was in the hospital on a psychiatric hold and could not leave. Robin and/or Aarica posted a failed inspection report and a letter from the HRA on Plaintiff's door knowing that Plaintiff would not be home for a long time to receive it and then emailed Plaintiff these documents and a picture of the documents posted on her door, knowing that Plaintiff was in the hospital and was a vulnerable adult and had physical and emotional injuries due to their conduct. This upset Plaintiff immensely and added severe stress and trauma to an already traumatic experience. They refused to remove the documents from Plaintiff's door and demanded an inspection for the next day, even though they knew Plaintiff was not able to leave the hospital and on a hold. The HRA posted private data on Plaintiff's door in retaliation for her discrimination and retaliation complaints and shortly after Plaintiff told them that she would be afraid to receive something posted on her door.

Bloomington HRA knew that Plaintiff was an extremely vulnerable person and that she was particularly susceptible to extreme emotional distress from discrimination, retaliation, posting of private information on her door and the refusal to pay her Housing Assistance Payments to intentionally cause her to be evicted and lose her housing subsidy.

155.    Defendant Bloomington HRA caused severe panic, extreme emotional distress, shock and disbelief, severe humiliation, months, heart arrhythmias and pain, exacerbations of physical pain and swelling to legs, nightmares and shaking, loss of self-esteem, among other things, to Plaintiff, a vulnerable adult/senior with mental and physical disabilities. Defendant's inhumane treatment of Plaintiff by the above actions, in addition to other acts, were intentional and illegal.    Defendant intentionally discriminated and retaliated against Plaintiff, intentionally belittled, insulted and humiliated Plaintiff because of her disabilities.

156.    The above items each alone and taken in conjunction with one another, caused Plaintiff severe emotional distress. Each and every act by Defendant listed above and listed in this Complaint was extreme, outrageous, intentional and/or reckless.

157.    As a result of Bloomington HRA and Aarica Coleman's actions, Plaintiff has suffered crying spells, she has gained a lot of weight due to severe depression and severe stress resulting from Defendants' actions, she has been hospitalized for three weeks, she has had heart palpitations/arrythmias and pain from the severe depression and stress, she has had severe panic attacks to where she couldn't speak and had stroke-like symptoms, she has had a worsening of her IBS, she has had shaking and nightmares, she has had severe anger, among many other things. Bloomington HRA and Ms. Coleman actions against Plaintiff exacerbated a hoarding disability and worsened Plaintiff's ability to care for herself and her apartment. Plaintiff has had

to increase her normal medication dosage and double her doctor visits as a direct result of Defendants' actions.

## Premier Properties

158.     The allegations in this complaint are hereby re-alleged and incorporated by reference.

159.     Defendant Premier Properties acted in an extreme and outrageous manner and in an intentional and reckless manner and their actions would have been utterly intolerable to most people in society. Their actions caused Plaintiff severe emotional distress.

160.     Premier Properties, Andrew Akins, Petra Larson and Bob Larson knew that Plaintiff had "special needs" and physical and mental disabilities and that substantially falsely reporting Plaintiff to the City of Bloomington for hoarding, infestation of flies and severe odor without notifying Plaintiff and causing three people from the City of Bloomington to make a surprise visit to her apartment for a surprise inspection would have been utterly intolerable to her.      Andrew Akins has refused to reasonably accommodate Plaintiff's disabilities and repeatedly threatened, over many months, to evict Plaintiff unless she paid him money/rent that she did not owe him. Mr. Akins threatened to take away Plaintiff's home and did not let up until Plaintiff was forced to pay him money she never owed him. Mr. Akins also falsely claimed that Plaintiff owed him the money and falsely portrayed Plaintiff as a dead-beat renter and a check bouncer. Premier Properties and the listed people in this paragraph knew that Plaintiff was an extremely vulnerable person who was particularly susceptible to emotional distress. Further, they knew that Plaintiff was on SSDI and was a senior.

161.     Defendant Premier Properties caused severe panic, extreme emotional distress, shock and disbelief, severe humiliation, months of fear to leave apartment, heart arrhythmias and

pain, exacerbations of physical pain and swelling to legs, nightmares and shaking, loss of self-esteem, among other things, to Plaintiff, a vulnerable adult with mental and physical disabilities.

162.    The above items each alone and taken in conjunction with one another, caused Plaintiff severe emotional distress. Each and every act by Defendant listed above and listed in this Complaint was extreme, outrageous, intentional and/or reckless.

163.    As a result of Defendants' actions, Plaintiff has suffered crying spells, she has gained a lot of weight due to severe depression and severe stress resulting from Defendants' actions, she has been hospitalized for three weeks, she has had heart palpitations/arrythmias and pain from the severe depression and stress, she has had severe panic attacks to where she couldn't speak and had stroke-like symptoms, she has had worsening back and leg pain and swelling, she has had shaking and nightmares, she has had severe anger, loss of self-esteem, among many other things. Plaintiff has had to increase her normal medication dosage and double her doctor visits as a direct result of Defendants' actions.

## RELIEF SOUGHT

164.    Plaintiff seeks the following damages:

a)    Issuing a declaratory judgment in favor of Plaintiff;

b)    Declaring that Defendants have engaged in discrimination and retaliation/reprisal in violation of the FHA and the Minnesota Human Rights Act;

c)    Awarding compensatory, statutory, consequential, and other damages to Plaintiff;

d)    Awarding Plaintiff interest and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

e)    Awarding costs and attorney fees to Plaintiff pursuant to 42 U.S.C. § 3613; and

78

f)    Granting such further relief, like punitive damages or any other damages, as the Court may deem just.

Dated: 11/28/2023

Claire J. Lee

Claire J. Lee
10101 Lyndale Ave So
Apt 219
Bloomington, MN 55420
(612)402-9206 (Cell)
Claire.1957@yahoo.com